IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,375

STATE OF KANSAS,
*Appellee*,

v.

LUTHER JOHNSON,
*Appellant*.

SYLLABUS BY THE COURT

1.

For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

2.

When reviewing the denial of a requested jury instruction, the appellate court reviews for error and, if found, for harmlessness. But when reviewing the failure to give an unrequested jury instruction, the appellate court must determine if the failure was clearly erroneous.

3.

Voluntary manslaughter is an intentional killing of a human being committed upon a sudden quarrel or in the heat of passion. A heat of passion involves any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror, based on impulse without reflection. A sudden quarrel is one form of heat of passion. An orchestrated confrontation or methodically planned encounter is the antithesis of a sudden quarrel.

4.

Under the facts of this case, the district court properly refused to give the jury an instruction on voluntary manslaughter as a lesser included offense of premeditated first-degree murder where the shooting death occurred because of the defendant's orchestrated actions.

5.

Unintentional second-degree murder is a killing of a human being that is not purposeful, willful, or knowing but which results from an act performed with knowledge that the victim is in imminent danger, although death is not foreseen. Reckless involuntary manslaughter is the unintentional killing of a human being committed recklessly.

6.

The district court was correct in failing to instruct the jury on unintentional second-degree murder and reckless involuntary manslaughter because the only inference to be drawn from the evidence was that the defendant intended to kill the victim.

7.

A claim that defendant was denied a constitutional right to present a full and complete defense under the Fourteenth Amendment to the United States Constitution is a

question of law subject to de novo review. The fundamental right to a fair trial is subject to statutory rules and caselaw interpreting the rules of evidence and procedure.

8.

Relevance is established by a material or logical connection between the asserted facts and the inference or result they are intended to establish. Relevant evidence, as defined in K.S.A. 60-401(b), is evidence having any tendency in reason to prove any material fact.

9.

Whether a third party was responsible for the crime a defendant is charged with is clearly a material fact related to determining the defendant's guilt or innocence. But without additional evidence showing that a third party could have committed the crime, evidence merely suggesting that someone other than the defendant had a motive to commit the crime has little probative value and can be properly excluded at trial.

10.

Under the facts of this case, without a connection between the shooting death and high general criminal activity in the area where the crime occurred, evidence of the latter has scant probative value for establishing that someone other than the defendant shot the victim.

11.

An appellate court reviews the denial of a continuance for abuse of discretion. Where a defendant claims the denial of a continuance interfered with his or her ability to present a defense, the appellate court reviews the question de novo.

12.

When a criminal defendant's constitutional right to secure counsel of his or her choice conflicts with the trial judge's discretionary power to deny continuances, the reviewing court must balance several factors in determining whether the trial court's conduct was fair and reasonable: (1) Whether a continuance would inconvenience witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the fault of the defendant; and (5) whether denial of a continuance would prejudice the defendant. Under the facts of this case, the district court did not abuse its discretion by denying the defendant's fourth motion for a trial continuance when each of the five factors weighs heavily against the defendant.

13.

A defendant's claim alleging ineffective assistance of counsel presents mixed questions of fact and law. Appellate courts review the underlying factual findings for support by substantial competent evidence and the legal conclusions based on those facts de novo.

14.

To establish ineffective assistance of counsel, the defendant must establish (1) that counsel's performance was constitutionally deficient, which requires a showing that counsel made errors so serious that his or her performance was less than that guaranteed by the Sixth Amendment to the United States Constitution, and (2) that counsel's deficient performance prejudiced the defense, which requires a showing that counsel's errors were so severe as to deprive the defendant of a fair trial.

15.

Under the facts of this case, the defense attorney's decision not to introduce telephone recordings containing information potentially harmful to the defendant but to

4

address credibility of a witness through other means was a sound strategic decision and not a constitutionally deficient performance.

16.

When considering the cumulative effect of trial errors, an appellate court has unlimited review.

17.

The doctrine of cumulative error does not apply where the reviewing court has not found the existence of more than one trial error.

18.

A trial court does not violate a defendant's constitutional rights by using prior convictions in calculating a criminal history score to enhance a sentence without requiring those convictions to be included in the complaint or proven to a jury beyond a reasonable doubt.

Appeal from Wyandotte District Court; MICHAEL GROSKO, judge. Opinion filed August 5, 2016. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause, and *Carol Longenecker Schmidt*, of the same office, was on the brief for appellant.

*Sheryl L. Lidtke*, chief deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, C.J.: Luther Johnson appeals his convictions on one count of first-degree murder and one count of aggravated burglary related to the shooting death of Derrick

Hill. Johnson contends the district court erroneously: (1) failed to instruct the jury on the offenses of voluntary manslaughter, unintentional second-degree murder, and reckless involuntary manslaughter; (2) excluded testimony that the shooting happened in a high crime area; (3) denied Johnson's request for a trial continuance; (4) denied Johnson's motion for a new trial based on ineffective assistance of counsel; (5) made a combination of rulings warranting a new trial; and (6) used Johnson's previous convictions for sentencing purposes without their being proven to a jury beyond a reasonable doubt.

We conclude Johnson's arguments are without merit. Accordingly, we affirm his convictions.

FACTS AND PROCEDURAL HISTORY

For 10 years Luther Johnson and Cerrina Nicole Griffin had an on-again, off-again relationship. At the time of Derrick Hill's fatal shooting, they had been "off" for at least 30 days. During this time, Griffin and her daughter stayed with Griffin's cousin Victoria Freeman and Freeman's infant son at Rosedale Ridge Apartments in Kansas City, Kansas. Because Betty Grace Kebert and her daughter also lived there, Freeman slept in one bedroom, Kebert in the other, and Griffin slept in the living room on an air mattress.

During the evening of August 20, 2010, several individuals, including Hill, visited Freeman's apartment to play cards and smoke marijuana. Later, Kebert and Demetrius Grant went to Kebert's bedroom while Griffin, Hill, and Freeman continued playing cards and watching television in the living room.

Shortly after midnight, Freeman locked her apartment's front door and the sliding glass door leading to the balcony before retiring to her bedroom. Griffin and Hill continued watching television until they both fell asleep on the air mattress with their heads near the balcony door.

6

The State's physical evidence and witnesses, including Griffin, showed that sometime around 3 a.m., Johnson climbed onto the apartment's balcony from outside and blew out the sliding glass door with a shot from a .45 caliber pistol. He then stepped into the apartment, called Griffin's name, and began arguing with her near the air mattress. Griffin and Hill did not have a sexual relationship, and she tried explaining to Johnson she was not having sex with Hill. During this argument with Griffin from just inside the shot-out balcony door, Johnson shot Hill in the left temple, and his pistol ejected a .45 caliber shell casing onto the blankets by the nearby couch. Griffin then fled to Kebert's bedroom with Johnson in pursuit. There, Johnson grabbed her arm and dragged her out of the apartment. When she resisted he told her if she did not come along he would "kill [her], too."

Grant testified he was asleep in Kebert's bed and awoke to the sound of a gunshot. According to Grant, a black male came into the bedroom, grabbed Griffin—whose name Grant did not know at the time—and the two left the apartment.

In Kebert's statement to police at the scene after the shooting, she too said Griffin and Johnson came into her bedroom, where he grabbed Griffin's arm and took her out of the apartment. Kebert further told police Johnson had his arm around Griffin's neck and a gun in his hand when she heard Griffin ask, "Luther, why'd you shoot him?"—but at trial, she denied these observations. Kebert testified she made these earlier comments to the police "to try to get my friend [Griffin] back to her daughter quicker."

Apartment resident Freeman likewise testified at trial somewhat differently from her statements at the scene. According to her earlier statements, after being awakened by Kebert, she called 911 and told the dispatcher that her cousin's boyfriend, Johnson, had shot out her balcony window and then shot Hill. Freeman told police that she was asleep in her bedroom when she awoke to a loud noise. She too said she had seen Griffin and

7

Johnson fighting and she heard Johnson say, "'I shot him.'" But at trial Freeman testified that her 911 calls and statements to police were simply based on what Kebert had told her once Kebert woke her up after the shooting.

Several other witnesses in neighboring apartments, including Lakisha Davis, LaShonda Barnes, and Gwendolyn Randle, testified to waking to gunshots and hearing a man yelling outside the apartment as well as a woman screaming. Davis and Randle testified that they ran to the front of their apartment and witnessed a black male saying to a woman, "Come on, before I kill you, too."

Griffin testified Johnson put her into the back seat of a green Mazda, told her to lie down, and drove off. As they drove away Johnson said what had happened was stupid and Griffin was at fault for Hill's death. According to Griffin's recorded police statement, testified to by Detective Michael Vega, Johnson admitted he had killed Hill and would not have had to if Griffin had not been a "ho" that night.

For the defense, Keyanhna Johnson testified she and Luther Johnson were at his mother's house watching a movie when Griffin repeatedly called. Luther then asked Keyanhna if he could borrow her car and jumper cables to give Griffin a jumpstart, but she refused. They went to bed around 2:30 or 3 a.m., and Johnson was gone when she awoke at 6 a.m.

Johnson testified that while he was watching the movie with Keyanhna, Griffin called asking him to pick up her mother and brother from Children's Mercy hospital because her car would not start. He initially refused but relented after Griffin called multiple times. According to Johnson, at one point Griffin told him she was staying at Freeman's, some people had entered the apartment, and one of them had a gun. He then picked up Griffin's mother and brother from the hospital around 2 a.m., dropped them off, and eventually drove to Freeman's apartment because he was worried about Griffin.

8

According to Johnson, while he was there Griffin told him an angry man named Mike had come by earlier because Hill had purchased some weed from Mike with counterfeit money. Griffin told him that Mike, who had "act[ed] like he was clutching on a gun," eventually left. Johnson testified that while he later was outside trying to start Griffin's car he heard gunshots and ducked around a car. Approximately 2 minutes later, he went into the apartment building to get Griffin. According to Johnson, Griffin and Kebert were screaming and acting hysterical, so he told Griffin they needed to go.

Johnson further testified he took Griffin to his sister's house and went to sleep. Later that night Griffin woke him up to tell him his face was on TV, and he was wanted for questioning. Johnson then called Kimberlee Carson who picked up Johnson and Griffin and let them stay at her house. Police ultimately arrested Johnson there several days later.

At trial, defense counsel requested a jury instruction on voluntary manslaughter, arguing the evidence established a heat of passion killing. The district court refused to issue the instruction, ruling that the evidence suggested the events preceding the shots demonstrated an argument or conversation exclusively between Griffin and Johnson, not Hill. The court later instructed the jury on premeditated first-degree murder, intentional second-degree murder, and aggravated burglary.

Ultimately, a jury convicted Johnson of premeditated first-degree murder under K.S.A. 21-3401(a) and aggravated burglary under K.S.A. 21-3716. Johnson later filed several motions including a motion for new trial, a pro se supplemental motion for new trial, a second supplemental motion for new trial, and accompanying memoranda in support.

The court denied the motions for new trial and sentenced Johnson to a hard 25 life sentence for the first-degree murder conviction to run concurrent to 57 months' imprisonment for the aggravated burglary conviction. Johnson timely appeals.

Jurisdiction is proper under K.S.A. 2015 Supp. 22-3601(b)(3), (4) (maximum sentence of life imprisonment imposed for an off-grid crime [first-degree murder]).

More facts will be added as necessary to the analysis.

ANALYSIS

Issue 1: *The district court did not err in failing to instruct the jury on voluntary manslaughter, unintentional second-degree murder, and reckless involuntary manslaughter.*

Johnson argues that the jury could have returned a conviction for voluntary manslaughter, unintentional second-degree murder, or reckless involuntary manslaughter had the district court given instructions on these offenses. The State generally responds that those instructions are not appropriate under the facts of this case.

*Standard of review*

To analyze jury instruction issues on appeal, this court follows a stair-step framework:

"'For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to

10

the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* ___ U.S. ___, 132 S. Ct. 1594 (2012).'" *State v. Salary*, 301 Kan. 586, 592, 343 P.3d 1165 (2015) (quoting *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 [2012]).

Johnson requested an instruction for voluntary manslaughter. So we look to see if denying the instruction was district court error and, if so, whether the error is harmless. *Salary*, 301 Kan. at 592. But Johnson did not request an instruction on either unintentional second-degree murder or reckless involuntary manslaughter. Consequently, we look to see if this lack of such jury instructions met the higher standard of being "clearly erroneous." K.S.A. 22-3414(3); *State v. Briseno*, 299 Kan. 877, 882, 326 P.3d 1074 (2014).

As with the requested instruction, for these two unrequested instructions we must first determine whether there was any error at all—*i.e.*, whether each instruction was legally and factually appropriate, employing an unlimited review of the entire record. See *Briseno*, 299 Kan. at 882-83 (quoting *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 [2013]). If no error, the analysis ends. But if error is found, then we must determine if it is clear error, *i.e.*, whether we are "'"firmly convinced that the jury would have reached a different verdict had the instruction error not occurred."'" 299 Kan. at 883 (quoting *Herbel*, 296 Kan. at 1121). Here, the burden to meet this standard is on Johnson. See 299 Kan. at 883 (quoting *Herbel*, 296 Kan. at 1121).

*Discussion*

    *Voluntary manslaughter*

    The first step to determine whether the district court erred by refusing to give the voluntary manslaughter instruction Johnson requested is to ask if the instruction was legally appropriate. *Salary*, 301 Kan. at 592. It was, because voluntary manslaughter is a lesser included offense of both first- and second-degree murder—for which instructions were given. See K.S.A. 21-3107(2)(a); *State v. Wade*, 295 Kan. 916, 924, 287 P.3d 237 (2012).

    Next, we examine whether the instruction was factually appropriate. Voluntary manslaughter is defined as an "intentional killing of a human being committed . . . [u]pon a sudden quarrel or in the heat of passion." K.S.A. 21-3403(a). Kansas considers sudden quarrel as one form of heat of passion. *State v. Johnson*, 290 Kan. 1038, 1048, 236 P.3d 517 (2010). Heat of passion is defined as "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror,' based 'on impulse without reflection.'" *State v. Hayes*, 299 Kan. 861, 864, 327 P.3d 414 (2014) (quoting *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 [1985]).

    The key elements of voluntary manslaughter are an intentional killing and legally sufficient provocation. *Hayes*, 299 Kan. at 864. When reviewing whether provocation was legally sufficient, an objective test is used:  "[T]here must be an adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason." 299 Kan. 861, Syl. ¶ 4.

    At trial, Johnson argued the evidence established a heat of passion killing. The State responded that no evidence had been presented of any provocation of Johnson by

12

the victim, Derrick Hill. The district court refused the instruction on voluntary manslaughter:

> "And what we have in that regard is an unlawful entry, a—two individuals being held at gunpoint, that there was an argument—and I don't know if 'argument' is the right term. There was a—at least from the testimony of Cerrina [Griffin], she was emotional and apparently she came to the conclusion that given the circumstances of her being in the same room with the deceased that apparently in her mind she thought this would infuriate Luther [defendant], so she immediately began talking to him.

> "And as I recall her testimony, it then, and perhaps understandably so, given the nature of the situation, she couldn't be real specific about what happened, as I recall, and counsel mentioned this. Her mouth was moving. Luther's [defendant's] mouth was moving. I even think she said Derek's [Hill's] mouth was moving; we have no idea what Derek may have said or may not have said.

> "But as I interpret the evidence, what was going on prior to the shot or shots being fired was pretty much exclusively between Cerrina Nicole [Griffin] and the defendant, with the deceased being in a position of just basically standing there. There is no testimony—Cerrina was the only source we have that he came at the defendant, that he said anything in particular to the defendant which could cause him to act in a certain way, that he rushed at him, threatened him, that he did anything. He was just basically standing there and at some point in time, then,—and this is what Cerrina Nicole says— the defendant shot him.

> "And applying an objective standard to those facts, or to at least Cerrina Nicole's ability to remember what had happened at that time, based upon the applicable case law, I'm going to find that instruction on voluntary manslaughter would not be appropriate in this case."

At the later hearing on Johnson's motion for a new trial, the court again explained why the voluntary manslaughter instruction was inappropriate:

13

"What happened here is that Mr. Johnson climbed up on a balcony of a place where he did not live, he was armed, shot out a window, entered the living room area, there was a significant pause, and then he shot a young man, who as the State points out, did nothing. Just got up, and then got shot. Now I suppose, Mr. Dent, [defense counsel] one might consider a heat of passion type thing if say you went to your own home and went to your own bedroom and walked in on your girlfriend, or whoever, and saw something going on, and you didn't have a gun on you, but you were so inflamed by that, there might be a gun or weapon handy, and you just grab it and spontaneously react to the situation. And that wasn't the case here.

"Mr. Johnson went to someplace he didn't belong to begin with. He was convicted of aggravated burglary for shooting out the window and entering, and then rather cold bloodily and with deliberation, shot the victim in the head. . . . I just don't know what to say about that, other than there is no evidence."

Johnson again argues that Griffin's testimony establishes an intense, emotional argument occurred that potentially resulted in Hill's death. The State counters sufficient provocation by the victim must exist but no evidence existed of any heated argument between Johnson and Hill.

For this analytical step—whether the voluntary manslaughter instruction was factually appropriate—we must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant as the requesting party, that would have supported the instruction. *Salary*, 301 Kan. at 592. In general, the district court must instruct the jury on the law for a lesser included offense "where there is some evidence which would reasonably justify a conviction of" it. K.S.A. 22-3414(3); *State v. Hilt*, 299 Kan. 176, 194, 322 P.3d 367 (2014).

Johnson relies upon other jurisdictions where some courts found heat of passion and voluntary manslaughter in situations he argues are factually similar to the present case. While he first cites the concurring opinion in *United States v. Martinez*, 988 F.2d

14

685 (7th Cir. 1993), that case involved a fight between several inmates at a federal correctional institution. Thus, our analysis is not aided by the concurrence's one-sentence discussion of "heat of passion" involving a cuckolded husband finding his wife and her lover *ín flagrante delicto.* 988 F.2d at 705 (Cudahy, J., concurring).

Johnson next cites *State v. Rainey*, 154 N.C. App. 282, 574 S.E.2d 25 (2002), where the defendant shot a man having a relationship with the defendant's sister. The defendant requested an instruction on attempted voluntary manslaughter. The North Carolina appellate court described the "typical" voluntary manslaughter situation as "homicide committed in the moments after discovering a spouse in the act of infidelity." 154 N.C. App. at 287. Accordingly, the dissimilar facts in *Rainey* do not provide helpful guidance.

Johnson also cites *People v. McCarthy*, 132 Ill. 2d 331, 547 N.E.2d 459 (1989), where the defendant found his girlfriend and a man lying in bed and shot both of them, killing the female. The Illinois Supreme Court listed several circumstances constituting sufficient provocation, including adultery with defendant's spouse. But the defendant and his girlfriend had never married and had broken up before the shooting. As a result, the court declined to determine whether adultery-based voluntary manslaughter should be extended beyond a marital relationship. 132 Ill. 2d at 341-42.

By contrast, our decision in *Wade*, 295 Kan. 916, provides more valuable guidance. Wade was convicted of the premeditated first-degree murder of his child's mother who called Wade to say that he could not see his son. Wade brought a handgun to the residence where she was staying, climbed through a window, and shot her. We held that a voluntary manslaughter instruction was not factually appropriate because there was no evidence of sudden quarrel where Wade "orchestrated the encounter which is the antithesis of an unforeseen event." 295 Kan. at 925.

15

In *Wade* we concluded the defendant's behavior leading up to the shooting—arming himself with a handgun before leaving home—implied he planned to use it in some manner during his encounter with the victim. His behavior simply did not support his contention that the murder was performed without reflection. We further noted that while Wade's anger with the victim may have provided a motive, the anger did not provide sufficient provocation for the shooting to be in the heat of passion. 295 Kan. at 926 ("A slow burn is not heat of passion.").

Similarly, Johnson's orchestration of the encounter does not suggest that his actions were merely taken "'on impulse without reflection.'" *Hayes*, 299 Kan. at 864. The evidence instead demonstrates Johnson armed himself with a loaded .45 caliber handgun, drove to the apartment where he knew Griffin—his former girlfriend—was staying, climbed up the balcony, and shot out the sliding glass door of the apartment. Although Johnson saw Griffin sleeping on an air mattress with Hill, no physical act was occurring.

Johnson paused after taking his glass-shattering shot—stepping into the apartment and talking with Griffin while she tried to convince him nothing was going on between Hill and her. Hill said nothing. Johnson then shot Hill in the left temple—per the testimony and photographs of the scene, from a distance less than the length of the air mattress. While Johnson blamed Griffin for making him do it and his jealousy may have provided a motive for killing Hill, under these circumstances it did not provide sufficient provocation for the shooting to be in the heat of passion.

Accordingly, a voluntary manslaughter instruction was not factually appropriate here. So the district court did not err in refusing to give it.

*Unintentional second-degree murder and reckless involuntary manslaughter*

Unlike the voluntary manslaughter instruction, Johnson did not request an instruction for unintentional second-degree murder or reckless involuntary manslaughter. As noted, we review these particular instruction challenges for clear error. *Briseno*, 299 Kan. at 882. We begin by acknowledging these instructions are legally appropriate because unintentional second-degree murder and reckless involuntary manslaughter are lesser included offenses of first-degree murder—for which instructions were given. *State v. Engelhardt*, 280 Kan. 113, 135, 119 P.3d 1148 (2005).

Again, we must next determine whether the instructions were factually appropriate. *Salary*, 301 Kan. at 592. Under K.S.A. 21-3402(b), unintentional second-degree murder is "the killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." Per K.S.A. 21-3404(a), involuntary manslaughter is "the unintentional killing of a human being committed . . . [r]ecklessly." And, "[r]eckless conduct is conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger." K.S.A. 21-3201(c). We have held reckless involuntary manslaughter differs from reckless second-degree murder only in the degree of recklessness required to prove culpability. *Engelhardt*, 280 Kan. at 135.

Johnson argues the Kansas legislature effectively has stated that proof a person acted intentionally also establishes he or she acted recklessly under K.S.A. 2015 Supp. 21-5202(c) which provides:

> "Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged. If recklessness suffices to establish an element, that element also is

17

established if a person acts knowingly or intentionally. If acting knowingly suffices to establish an element, that element also is established if a person acts intentionally."

But neither Johnson nor the State addresses K.S.A. 2015 Supp. 21-5103(d), involving the scope and application of the Kansas Criminal Code, which provides:

> "*This code has no application to crimes committed prior to July 1, 2011*. A crime is committed prior to the effective date of the code if any of the essential elements of the crime as then defined occurred before that date. Prosecutions for prior crimes shall be governed, prosecuted and punished under the laws existing at the time such crimes were committed." (Emphasis added.)

Because the fatal shooting of Hill was performed on August 21, 2010, Johnson's arguments based upon K.S.A. 2015 Supp. 21-5202 necessarily fail.

We now resume our review for factual propriety of the two instructions. We observe that "second-degree reckless murder is a killing of a human that *is not purposeful, willful, or knowing* but which results from an act performed with knowledge that the victim is in imminent danger, although death is not foreseen." (Emphasis added.) *State v. Killings*, 301 Kan. 214, 225-26, 340 P.3d 1186 (2015). And an instruction for reckless involuntary manslaughter is appropriate when the act resulting in death was intentional, but the defendant did not intend to kill the victim. *State v. McCullough*, 293 Kan. 970, 978-79, 270 P.3d 1142 (2012).

In *Killings*, this court held that a requested, but rejected, second-degree reckless murder instruction was factually inappropriate where the evidence established Killings went to the apartment to exact revenge, pointed a gun at the victim, taunted him, and shot at him multiple times, hitting him once. We reasoned the only inference that could be gleaned from this evidence was that Killings intended to kill the victim. 301 Kan. at 227. We contrasted two cases: *State v. Cordray*, 277 Kan. 43, 56, 82 P.3d 503 (2004)

18

(evidence sufficient to support jury verdict of unintentional but reckless second-degree murder where the defendant fired a gun in the general direction of a vehicle at night, striking an occupant); *State v. Jones*, 27 Kan. App. 2d 910, 915, 8 P.3d 1282 (2000) (held jury could have found evidence supporting recklessness where witnesses testified defendant shot gun randomly over crowd of people with eyes closed). See also *State v. Mitchell*, 23 Kan. App. 2d 413, 416-17, 422, 932 P.2d 1012 (1997) (Defendant claimed victim had pulled a gun on him and he was afraid for his life, so he pulled out his own gun, closed his eyes, and began shooting. Reversed and remanded for instruction on involuntary manslaughter.), *cited in State v. Houston*, 289 Kan. 252, 275, 213 P.3d 728 (2009).

Here, like *Killings*, the only inference that can be gleaned from the trial evidence was that Johnson intended to kill Hill. We recognize Johnson testified he was in the parking lot during the shooting. But as mentioned in the analysis of the voluntary manslaughter issue, the State's evidence demonstrated that he took a loaded handgun and drove to the apartment where he knew his ex-girlfriend, Griffin, was staying; climbed up the balcony; shot out the glass door; and entered. After some discussion with Griffin, he shot Hill in the left temple with a .45 caliber handgun—according to the testimony and photographs, from a distance less than the length of the air mattress. See *Houston*, 289 Kan. at 275-76 (among other things, evidence showed defendant shot victim in face with 12-gauge shotgun from within 15 feet; court rejected involuntary manslaughter instruction after concluding no rational jury could have found defendant did not intend to kill victim). Shortly after the shooting Johnson told Griffin if she did not come with him he would kill her too and she was at fault for Hill's death. In short, no reasonable jury would conclude he acted recklessly. See K.S.A. 22-3414(3) (judge shall instruct the jury "where there is some evidence which would reasonably justify a conviction of some lesser included crime").

19

As a result, jury instructions for both unintentional second-degree murder and involuntary manslaughter were not factually appropriate. So the district court's failure to so instruct certainly could not be clearly erroneous as required for unrequested instructions. See *State v. Cooper*, 303 Kan. 764, 769, 366 P.3d 232 (2016).

Issue 2: *The district court did not err by excluding evidence that the shooting occurred in a high crime area and that someone had threatened Johnson and Griffin and vandalized Griffin's car.*

Johnson argues the district court denied him his right to a full and complete defense by excluding evidence that (1) Rosedale Ridge Apartments, where the shooting took place, was a "high crime" area, and (2) someone had threatened Johnson and Griffin and vandalized Griffin's car. Both categories of evidence allegedly support a theory that someone besides Johnson fatally shot Hill. The State responds there was no basis to legally admit any evidence about the high crime area.

*Standard of review*

A claim that defendant was denied a constitutional right to present a full and complete defense under the Fourteenth Amendment to the United States Constitution is a question of law subject to de novo review. *State v. Maestas*, 298 Kan. 765, 780, 316 P.3d 724 (2014). But the fundamental right to a fair trial is "subject to statutory rules and caselaw interpreting the rules of evidence and procedure." 298 Kan. at 781 (citing *State v. Wells*, 289 Kan. 1219, 1235, 221 P.3d 561 [2009]).

When this court considers a challenge to exclusion of evidence, we first consider relevance, which is established by

> "'a material or logical connection between the asserted facts and the inference or result they are intended to establish. [Citation omitted.] Relevant evidence, as defined in K.S.A.

60-401(b), is "evidence having any tendency in reason to prove any material fact." In *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008), we explained that this definition of "relevance" contains both a materiality element and a probative element. There, we held that an appellate court reviews a district court's determination of materiality de novo and the assessment of probative value under an abuse of discretion standard. [Citation omitted.]'" *State v. Burnett*, 300 Kan. 419, 427, 329 P.3d 1169 (2014) (quoting *State v. Ultreras*, 296 Kan. 828, 857, 295 P.3d 1020 [2013]).

See *State v. Brown*, 285 Kan. 261, 303, 173 P.3d 612 (2007).

In considering evidence that a third party is responsible for committing a crime, we have stated:

"Whether a third party was responsible for the crime a defendant is charged with is clearly a material fact related to determining the defendant's guilt or innocence. We have previously stated that '[w]hile evidence of the motive of a third party to commit the crime, standing alone, is not relevant, *such evidence may be relevant if there is other evidence connecting the third party to the crime*.' *State v. Brown*, 285 Kan. 261, Syl. ¶ 26, 173 P.3d 612 (2007). In other words, without additional evidence showing that a third party could have committed the crime (*e.g.,* presence at the crime scene, the opportunity and means to commit the crime), *evidence merely suggesting that someone other than the defendant had a motive to commit the crime has little probative value and can be properly excluded at trial.* 'A district court judge must evaluate the totality of facts and circumstances in a given case to determine whether the defense's proffered evidence effectively connects the third party to the crime charged.' 285 Kan. 261, Syl. ¶ 27. *Because the district court's determination of this question contemplates whether the proffered evidence is probative to establishing a third party's involvement in the charged crime, the district court's decision is reviewed for an abuse of discretion*." (Emphasis added.) *Burnett*, 300 Kan. at 431-32.

21

*Discussion*

At the outset, we observe that evidence of Griffin's vandalized car and threats to Johnson and Griffin was admitted at trial. As a result, Johnson's arguments about their erroneous exclusion have no merit. His counsel expressly cross-examined Griffin about the vandalism to her car and threats made to Johnson:

"Q.  Okay. *And at some time did he break down and say he was scared? There were threats?*
"A.  *I mean, he said he was scared.*
"Q.  *Did anybody make any mention of somebody tearing up your car?*
"A.  *Yeah, we heard it from someone.*
"Q.  *Who did you hear it from?*
"A.  *Quite a few people.*
"Q.  But you said you weren't in contact with people, so who are the quite a few people you heard it from?
"A.  I don't know, you would have to ask him. He was the one getting the information.
"Q.  So he was in contact with people, but you weren't.
"A.  That's correct.
"Q.  Okay. So he found out from Victoria or Vicky or whoever that your car had been damaged?
"A.   I don't know who he found out from." (Emphasis added.)

Additionally, Johnson himself testified during direct examination that he was receiving threats and that one of the residents of the apartment had called him to say someone "was messing [Griffin's] car up." And during the State's rebuttal, a detective testified that while obtaining a statement, Johnson told him, "'I hear I'm getting threats that people are going to kill me.'"

As for Johnson's arguments the court erred by excluding evidence that the fatal shooting occurred in a "high crime" area, he claims such evidence was relevant to prove

the material fact of identity. Specifically, his defense was premised on his not being in the apartment when Hill was shot; thus someone else pulled the trigger. The State responds that admitting evidence that "other people" might have killed the victim, standing alone, is not relevant.

On the first day of trial, defense counsel asked Officer Jared Shearer if he would "describe Rosedale Ridge as a high crime area?" The court sustained the State's objection on relevance grounds. Defense counsel then argued there was no physical evidence against Johnson so the theory was "if not him, then who?" He reasoned evidence that this was a high crime area, where one other "shots fired" police call happened that day and six or seven "shots fired" calls happened that month, would thus be relevant.

The State countered it had direct evidence that Johnson was the only one in the apartment with a gun; that he admitted telling Griffin he shot Hill and it was her fault; and that it had considerable circumstantial evidence. The State therefore argued evidence that some other person might have fired the shots was "irrelevant, speculative, and we believe misleading to the jury." The district court confirmed its exclusionary ruling but said it was willing to revisit the issue if the parties were able to provide caselaw before the other detectives testified.

On the second day of trial, defense counsel acknowledged that he could not find any caselaw directly on point but submitted:

> "I certainly think the fact that this particular apartment complex in the month of August alone had seven shots-fired calls, three of them in this apartment building; two shootings not including—two shootings total; five armed disturbances; one armed robbery; five attempts to locate wanted persons; two suspicious persons; and four suspicious crowd calls there in the building—or there in the complex. There was a separate shots-fired call from this particular building in that complex this same day.

"And so, I believe that—that it does at least show that there are other people on the grounds out there who are clearly armed, who have firearms that there is certainly the opportunity to commit this crime. *I believe it is more than just me standing up here trying to argue blankly that somebody else could have done it that there is at least a record that there are other people at that complex who are armed and causing problems.* And I think it is more than just tangential. . . . *I clearly think that it is a natural or logical connection here to say we believe some other dude did it and that there certainly is evidence that there are other people out there armed and causing problems.*" (Emphasis added.)

The State responded there was no evidence that anyone besides Johnson was "out to get Derek Hill;" that this "high-crime area" evidence would allow the jury to consider evidence that had no relevance; and the defense based on third party evidence requires specific information to implicate another person.

The district court once again agreed with the State:

"I believe you're correct. Well, you know, statistically I guess Wyandotte County and probably Sedgwick County are considered the high-crime counties in the state, and so just because something happens in Wyandotte County or Sedgwick County, you can't in every criminal trial say, well, this happened in a high-crime county. *And then you further go down into areas, well, just because a crime happened in an area where crimes happen does not necessarily have any connection to that crime, we'd be hearing this evidence in nearly every criminal case that we have. I think it is kind of fact-driven.*

"Let's say the facts in this case were that the victim was standing by the window, a bullet came from somewhere, went through the window, and then hit him. In other words, it could be argued factually that this was some random shot that was fired. There's lots of shots fired in that area that could be a factual possibility. Well, then maybe I think you could talk about there's lots of gunfire in this area, and it could have happened that way as opposed to some evidence of an individual.

"*But what you have here is a shell casing on the balcony, a shell casing inside the apartment, so it's not—it's a factual scenario where a person was standing right there*

24

*and firing the shots. And so given the way the crime apparently was committed, I don't see that the fact that it occurred in what one may, quote/unquote, consider a 'high crime area' would be relevant, so your request is once again denied.*" (Emphasis added.)

At the hearing on Johnson's motion for new trial, defense counsel again argued Johnson was not allowed to completely present his defense that someone else had committed the crimes. The district court yet again rejected this argument that relied upon third party evidence:

"As far as the allowing the evidence of gunshots in the area and other crimes that may have gone on near this period of time, I just didn't see at the time how that would be relevant and probative of anything in terms of a defense. Basically, all the—all that would show is that this particular homicide occurred in what might be referred to as a high crime area. And if every time you have a trial, whether it's a robbery or a burglary or happens to be homicide, you don't bring in evidence that well, you know, two days ago, there were shots fired down the street. I mean its not probative of anything, other than you know, that's just kind of what the area is like. *And you would have to have more than that, I think, to somehow tie it into this specific incident. And it just wasn't there. It was just speculative not probative.*" (Emphasis added.)

On appeal, the State contends the facts of the instant case are similar to those in *State v. Knox*, 301 Kan. 671, 347 P.3d 656 (2015). There, Knox argued evidence of guns and drugs found in the home near the murder scene was relevant to show someone else, such as a rival drug dealer, could have committed the murder. Knox reasoned most people know that drug houses are inherently dangerous, and someone inside could have shot the victim. We rejected the argument, stating:

"Yet, evidence of a third party's motive, on its own, will be excluded for relevance where nothing else connects the third party to the crime. See *State v. Carr*, 300 Kan. 1, 197-203, 331 P.3d 544 (2014). And nothing in this case connects a third party to the crime. The simple presence of guns and drugs in a house that Morris never had a

chance to enter does not lead to an inference that someone else was involved in Morris' murder. Witnesses saw two or three men walk towards Morris' Mustang, shoot Morris, and then leave in vehicles. No evidence suggested the involvement of anyone other than Knox and his companions; nothing implicated anyone who entered or exited the house. *Nor was there any suggestion that Morris' murder had anything to do with the drugs and guns found in the house. Theoretically, a house with drugs and guns can be a dangerous place, but that alone has no tendency to show that an unidentified and unseen person from the house or an unidentified rival drug dealer killed Morris.*" (Emphasis added.) 301 Kan. at 689.

We held that because the presence of guns and drugs was not material and probative to whether Knox murdered the victim, the district court did not err in excluding the evidence and Knox's right to present his defense therefore was not violated. 301 Kan. at 690.

Our decision in *Burnett*, 300 Kan. 419, also provides valuable guidance. Burnett was convicted, among other things, of felony murder for firing a gun into the residence of a man with whom he had a dispute. Burnett argued the district court erred in excluding evidence that other shootings previously had occurred at the home—which he offered to raise the possibility that someone else may have shot at the residence. We upheld the district court's exclusion, stating:

"In this case, Burnett proffered evidence establishing that Ramsey's house was the target of shootings before and after July 7 and suggested that because the house had been the target of other shootings—which he claimed were drug related—it was possible that someone else was responsible for the July 7 shooting. Though the evidence tends to show that the house attracted criminal activity, it fails to identify or show that someone other than Burnett was responsible for the July 7 shooting. *Without evidence connecting the prior or subsequent shootings to the July 7 shooting (e.g., the same gun was used in all the shootings), the evidence of prior or subsequent shootings has little probative value to establishing the material fact that someone other than Burnett committed the July 7 shooting.*" (Emphasis added.) 300 Kan. at 433.

26

Without a connection between the shooting and high general criminal activity, evidence of the latter has scant probative value for establishing that someone other than Johnson shot Hill. Moreover, Johnson was already able to present evidence that a third party named "Mike"—an otherwise unidentified and reputed drug dealer—may have shot Hill because Hill paid Mike for drugs with counterfeit money.

Consequently, the district court did not abuse its discretion by excluding the high crime area evidence. See *Burnett*, 300 Kan. 431-32 (district court's decision on whether proffered evidence is probative to establishing a third party's involvement in the charged crime is reviewed for an abuse of discretion). Johnson's right to present his defense therefore was not violated.

Issue 3: *The district court did not err in denying Johnson's request for a trial continuance.*

Johnson argues the district court abused its discretion by denying a request for continuance by his retained counsel, William Dunn, who entered an appearance 6 days before trial. He claims (1) the continuance would not have inconvenienced the witnesses, court, counsel, or parties; (2) legitimate reasons existed for the delay; and (3) denial of the continuance prejudiced him by denying him effective assistance of counsel. Unsurprisingly, the State responds the court did not arbitrarily deny Johnson's request.

*Standard of review*

K.S.A. Supp. 22-3401 provides that "[c]ontinuances may be granted to either party for good cause shown." We review the denial of a continuance for abuse of discretion. *State v. Robinson*, 303 Kan. 11, 90, 363 P.3d 875 (2015) (citing *Burnett*, 300 Kan. at 436).

27

We often have stated that judicial discretion can be abused in three general ways: where judicial action is arbitrary or based on an error of law or fact. *State v. Warrior*, 294 Kan. 484, 505, 277 P.3d 1111 (2012). The party asserting abuse of judicial discretion has the burden to prove it on appeal. *State v. Smith-Parker*, 301 Kan. 132, 161, 340 P.3d 485 (2014). Additionally, where a defendant claims the denial of continuance interfered with his or her ability to present a defense, we review the question de novo. *Robinson*, 303 Kan. at 90; *State v. Lewis*, 299 Kan. 828, 846, 326 P.3d 387 (2014).

*Discussion*

"An essential element of the Sixth Amendment's protection of the right to counsel is that a defendant must be afforded a reasonable opportunity to secure counsel of his or her choosing." *State v. Anthony*, 257 Kan. 1003, 1018, 898 P.2d 1109 (1995) (citing *Powell v. Alabama*, 287 U.S. 45, 53, 53 S. Ct. 55, 77 L. Ed. 158 [1932]). Although "an accused must be provided a fair opportunity to obtain counsel of his or her choice, this right cannot be manipulated to impede the efficient administration of justice." 257 Kan. at 1019 (citing *State v. Bentley*, 218 Kan. 694, 695, 545 P.2d 183 [1976]). The United States Supreme Court has explained some of the tension in this area:

> "Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; *only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel. Ungar v. Sarafite*, 376 U.S. 575, 589[, 84 S. Ct. 841, 11 L. Ed. 2d 921] (1964)." (Emphasis added.) *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983), *quoted in Robinson*, 303 Kan. at 85.

28

As this court stated in *Anthony*: "'When a criminal defendant's constitutional right to secure counsel of his choice conflicts with the trial judge's discretionary power to deny continuances, the reviewing court must balance several factors in determining whether the trial court's conduct was "fair and reasonable."'" 257 Kan. at 1119 (quoting *United States v. Kelm*, 827 F.2d 1319, 1322 [9th Cir. 1987]). These factors are: "(1) [W]hether a continuance would inconvenience witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the fault of the defendant; and (5) whether denial of a continuance would prejudice the defendant." *Robinson*, 303 Kan. at 90 (quoting *Anthony*, 257 Kan. at 1019).

We begin our analysis with a review of events. On August 23, 2010, Johnson was charged with the crimes arising out of the Hill shooting. Steven Alexander was appointed as his counsel. In November 2010, Johnson's request for new counsel was granted and Patricia Kalb was appointed as his second counsel. Following his February 28, 2011, preliminary hearing, Johnson was bound over for trial, which was set for May 9, 2011.

On April 15, 2011, over the State's objection, Johnson was granted a continuance and trial was reset for August 22, 2011. Johnson then filed another motion for continuance asserting his family was hiring private counsel to defend him. After an August 4, 2011, hearing, the court ruled that Johnson presented no evidence of an attorney being hired.

Five days later on August 9, 2011, Johnson filed a pro se motion for change of counsel, and a hearing was held August 12, 2011. The court noted that although Johnson's actual complaints about his attorney were not significant, Johnson clearly had lost confidence in Kalb. It granted his request for new counsel and again continued the trial.

29

On August 15, 2011, Michael Nichols was appointed as Johnson's third counsel, and the court later set trial for a third date: January 23, 2012. On January 3, 2012, three weeks before trial, Johnson filed a pro se motion to replace Nichols as counsel, and Nichols filed a motion to continue the jury trial.

On January 20, 2012, the court denied Johnson's motion for new counsel but granted the motion for continuance. At the February 23, 2012, status conference, the court set trial for a fourth date: April 16, 2012.

Five days before trial, on April 11, 2012, William Dunn entered an appearance as Johnson's retained counsel—his fourth counsel overall. Dunn also moved the court to continue the jury trial—now set for April 16—to a fifth date. At a hearing the next day, Dunn explained that he would not be prepared to try a murder case 4 days later. Dunn told the court if it did not grant the continuance, he planned to withdraw and allow Nichols to proceed as counsel.

At that hearing, the State asked the court to deny the motion because of the number of continuances previously granted to Johnson; the multiple attorneys already appointed to represent him; the inconvenience to witnesses, jurors, counsel, and the court; and the defense's failure to demonstrate any legitimate reason for delay. The district court agreed with the State and, after applying the factors identified in *Anthony*, denied the motion:

> "Mr. Johnson has had since August the 23rd of 2010, for either himself or as Mr. Dunn tells us here today, his retainer is coming from family and friends for his family and friends to put retainer money together and hire some other counsel. Quite frankly, I don't even know if Mr. Dunn is in fact Mr. Johnson's counsel of choice. . . .
>
> "But that doesn't matter how that went because it's absolutely clear to me based on the record in this case that all of Mr. Johnson's actions in this case in getting, one, two,

30

three, prior trial settings continued is to delay a resolution of this case to manipulate basically to put it in the vernacular to gain [game] the system. I'm trying to get a lawyer to work for me, and put off, as I stated, a resolution in this case.

"And Ms. Lidtke [prosecutor] has stated, she has subpoenas issued. She has people personally served. Mr. Nichols [defense attorney] has been diligently been working on this case for the last six months, we've had several hearings where I've heard several motions that Mr. Nichols has filed. He has subpoenas out. Like I said, been working for six months, knows the case, knows what's in the State's file and I have no doubt in my mind has been pursuing whatever defenses are available to his client. . . . Subpoenas have been issued. Both counsel, I'm sure, have talked to and interviewed their witnesses. This is the second time this case has been set in front of this division of the Court. Based upon the Court's schedule of things coming up, I don't know when in the world we could get to this again in a reasonable timeframe. Jurors, as Ms. Lidtke has pointed out, have already been called in. All of that applies to that factor. Whether other continuances have been granted, we've already talked about that extensively. *Whether legitimate reasons exist for the delay and I'm not aware of any legitimate reason, other than the fact that the defendant, once again, wants to once again to have a new attorney. And in my view, that is done for the purposes of delay.*

. . . .

"*. . . Whether the delay is the fault of the defendant that's clear in this case. The continuance at his request. All previous delays were attributable to the defendant.* Whether the denial of the continuance would prejudice the defendant, I do not see any way that this delay would prejudice the defendant. For the past year and a half, he has had two highly competent counsel working on this case and I don't see the changing counsel at this stage of the game would in any way prejudice him. That would only cause other difficulties, therefore based on that record of facts and law, *I find that the request for a continuance should be and is hereby denied.*" (Emphasis added.)

Dunn then asked for permission to withdraw, which was granted. Later, Johnson again raised his continuance argument when seeking a new trial. An evidentiary hearing

31

on the motion for new trial was held, and Johnson was represented by his fourth appointed counsel, Paul Dent. Both Dunn and Nichols testified, and the court affirmed both its earlier decision and underlying rationale.

Dunn's requesting a continuance so he could remain as Johnson's newly-retained counsel was the functional equivalent of requesting a continuance so he then could be retained as new counsel. See *Anthony,* 257 Kan. at 1019 (counsel would not enter an appearance in case without first securing a continuance). So the test applied in *Anthony* applies here.

Under the first *Anthony* factor—*i.e.*, whether a continuance would inconvenience witnesses, the court, counsel, or the parties—Johnson argues no specific evidence shows such an inconvenience. The State responds that another continuance would have inconvenienced everyone including the 22 witnesses ready to testify for the State— particularly those already subpoenaed—and the 60 jurors who had been summoned for the April 2012 trial. At the continuance hearing, the State argued this was "not an easy case to try because we don't have cooperation from a lot of witnesses, so we have gone through a lot of steps to secure personal attendance, some of the primary material witnesses in this case." Additionally, the court pointed out that the witnesses had been interviewed by both attorneys and it would be difficult to schedule a new trial date in a reasonable timeframe. Accordingly, this factor weighs in favor of the State.

The second factor—*i.e.*, whether other continuances have been granted—also weighs in favor of the State. Johnson had already requested and received three continuances of his scheduled trial settings—April 15, 2011, August 12, 2011, and January 20, 2012—and the State objected to two of them. In short, the court rejected Johnson's fourth request, *i.e.*, for a fifth trial setting.

Under the third factor—*i.e.*, whether legitimate reasons exist for the delay—Johnson argues Dunn needed time to prepare to effectively represent Johnson. He contends he was required to choose between two of his Sixth Amendment rights: to retain private counsel and to receive effective assistance of counsel. Nichols was the third attorney appointed to represent Johnson, however, and was prepared to go to trial. The court noted that the only possible legitimate reason for the delay was that Johnson wanted yet another new attorney—but merely for the purposes of creating a delay. Accordingly, this factor weighs in favor of the State.

As for the fourth factor—*i.e.*, whether the delay is the fault of the defendant—Johnson argues attributing the delay to him amounts to punishing him for his financial circumstances. The State responds that he had had a reasonable time to hire an attorney of his choice. It points out Johnson was charged in August 2010 and had been granted three continuances and been appointed three attorneys before Dunn's motion for continuance in April 2012. As early as August 2011, Johnson expressed his desire to hire retained counsel. However, after a hearing, the district court found no evidence that an attorney was being hired at that time. It took Johnson 8 additional months to obtain retained counsel. The delay was properly attributed to Johnson. So this factor weighs in favor of the State.

Under the final factor—*i.e.*, whether denial of a continuance would prejudice the defendant—Johnson argues the continuance denial made Dunn withdraw and left him with Nichols who provided ineffective assistance of counsel. The State responds no substantial rights were prejudiced by denial of Johnson's fourth request for continuance and resetting to a fifth trial date. Indeed, Dunn was not told he could not participate in the trial, but he nevertheless chose to withdraw. Additionally, as analyzed below, Johnson has not demonstrated that he was denied effective assistance of counsel at trial.

33

When we balance these *Anthony* factors, they easily support denial of a continuance. This denial is bolstered by *Anthony* itself. There, 18 days before trial, Anthony retained counsel who promptly sought a continuance though the case had been pending for 6 months. Counsel explained the funds were not available to retain him until shortly before trial, and he would need at least 2 months to prepare for trial. Anthony had already been granted one continuance, and speedy trial rights would have demanded that Anthony's case be severed from his codefendants. After listing the factors from *Kelm*, 827 F.2d at 1322 n.2, the *Anthony* court found no abuse of discretion in denying the continuance where (1) the only reason for the continuance was to allow new counsel to enter his appearance and (2) the district court made no attempt to restrain him from entering the case. 257 Kan. at 1019-20. Similarly, in the instant case Dunn was not barred by the district court from representing Johnson at trial.

Accordingly, we conclude the district court did not abuse its discretion by denying Johnson's fourth motion for a trial continuance.

Issue 4: *The district court did not err in denying Johnson's motion for new trial based on ineffective assistance of counsel.*

Johnson argues the district court abused its discretion by denying his motion for new trial based on ineffective assistance of counsel. Johnson claims his counsel was ineffective for: (1) spending a significant amount of time encouraging him to accept a plea agreement, *i.e.*, apparently making him unprepared for trial; and (2) mishandling evidence calling into question Griffin's credibility. The State denies counsel was ineffective.

34

*Standard of review*

We use a well-known standard for reviewing alleged performance errors by counsel: They present mixed questions of fact and law. *State v. Cheatham*, 296 Kan. 417, 430, 292 P.3d 318 (2013). Consequently, appellate courts review the underlying factual findings for support by substantial competent evidence and the legal conclusions based on those facts de novo. *State v. Burnett*, 300 Kan. 419, 452, 329 P.3d 1169 (2014).

> "To establish ineffective assistance of counsel, the defendant must establish (1) that counsel's performance was constitutionally deficient, which requires a showing that counsel made errors so serious that his or her performance was less than that guaranteed by the Sixth Amendment to the United States Constitution, and (2) that counsel's deficient performance prejudiced the defense, which requires a showing that counsel's errors were so severe as to deprive the defendant of a fair trial. *Cheatham*, 296 Kan. at 431.

> "Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 (2009). To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Cheatham*, 296 Kan. at 431." *Burnett*, 300 Kan. at 452.

The district court denied Johnson's request on both the performance and prejudice prongs of his claim.

*Discussion*

At the outset, we observe that Johnson fails to provide any argument in his brief to support his claim that defense counsel Nichols spent a significant amount of time before trial encouraging him to accept a plea agreement. Accordingly, it is deemed abandoned. See *State v. Bowen*, 299 Kan. 339, 355, 323 P.3d 853 (2014) (when a litigant fails to adequately brief an issue it is deemed abandoned).

As for Johnson's argument concerning the alleged mishandling of evidence of Griffin's credibility, we acknowledge that a counsel's failure to impeach the credibility of a witness whose testimony is vital to the State's case can prejudice the defendant and constitute ineffective assistance. *State v. Brooks*, 297 Kan. 945, 952-54, 305 P.3d 634 (2013). But we also acknowledge that "[t]he decisions on what witnesses to call, whether and how to conduct cross-examination, . . . and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his or her client." *Bledsoe v. State*, 283 Kan. 81, 92, 150 P.3d 868 (2007). "'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *State v. Betancourt*, 301 Kan. 282, 311, 342 P.3d 916 (2015) (quoting *Rowland v. State*, 289 Kan. 1076, 1083, 219 P.3d 1212 [2009]). And defendant bears the burden of demonstrating that trial counsel's alleged deficiencies were not the result of strategy. *State v. Gleason*, 277 Kan. 624, 644, 88 P.3d 218 (2004) (citing *Ferguson v. State*, 276 Kan. 428, 446, 78 P.3d 40 [2003]).

Johnson specifically asserts his counsel's failure to introduce jailhouse recordings of his recent telephone conversations with Griffin—where she stated the police only wanted to hear one version of the events of August 21, 2010, *i.e.*, an untruthful version harmful to Johnson—constitutes ineffective assistance. He contends the State's case hinged largely on Griffin as the only eyewitness, and Nichols' failure to introduce evidence "that directly dealt with Griffin's credibility is a deficient trial strategy."

The State responds that the jury clearly knew Griffin's trial testimony was inconsistent with her statements to police, her preliminary hearing testimony, and her conversations with Johnson. Among other things, it also points out that Nichols cross-examined Griffin extensively about her phone calls with Johnson. The State argues the phone calls could be interpreted as Johnson trying to influence her testimony and Nichols' opinion that the calls would be harmful was a reasonable, strategic decision.

Review of the record demonstrates that only a brief exchange from the recorded conversation on April 15, 2012, was quoted in Johnson's second supplemental motion for new trial:

"Luther:  were they trying to force you to say what they want you to say?
"Cerrina:  Yeah, pretty much. And I'm muthafuckin' scared (unintelligible) if I could told 'em, I would of told 'em a long muthafuckin' time ago. (unintelligible) *They just want to hear what they want to hear, they don't want to hear the truth. They want me to tell 'em what they want me to tell 'em.*" (Emphasis added.)

Neither the recorded conversations nor the entire transcripts are in the record on appeal. See *State v. Cervantes-Puentes*, 297 Kan. 560, Syl. ¶ 3, 303 P.3d 258 (2013) (party alleging a trial error has the burden of designating a record that affirmatively shows prejudicial error). Johnson's failure to provide the entire transcript or recording on appeal clearly hinders this court's analysis. See *Gleason*, 277 Kan. at 647 (on ineffective assistance of counsel claim, letters introduced into evidence were not part of record on appeal, and only portions of those letters were read into the record, two of which are quoted in the opinion).

With this in mind, we observe that at the hearing on Johnson's motion for new trial he testified about this conversation and Nichols' decision not to place its recording into evidence:

37

"[A]fter she [Griffin] said what she said, that I started going off, and he [Nichols] didn't want to present it to the jury, because it would make me look like a monster. And I said, no, you should play it because they playing with my life. So whatever I say afterwards, shouldn't have nothing to do with you playing this tape. Because anybody going to get mad if somebody is sitting there telling them that somebody is forcing them to play with their life."

Nichols indeed explained at the same hearing that he reviewed all of the telephone conversations and concluded they would do more harm than good to the defense. He testified there were other instances during the conversations where it appeared Johnson was trying to get individuals to say certain things, and Nichols did not want that to come out at trial.

"Q: So the bottom line is you felt like it hurt him more than it would have helped him?
"A: I did, because [Griffin] never would come out and say that he didn't do this, or that she had lied on the stand. It was just a point where she said that 'Everybody wants me to say what they want that me to say.' And he said, 'What is the truth, that I didn't do this.' And she simply hung up. He asked her, 'Why did you do that today.' And she said, 'I had to.' *I mean there was no clear admission that she had lied or that she had been influenced or anything like that. But on the other hand, there were other instances that it would appear that Luther was trying to get other people [to] say certain things, and I did not want that to come out in trial."* (Emphasis added.)

Nichols actually cross-examined Griffin about these conversations and highlighted her statements:

"Q.    You said you have talked to Luther on the phone since this happened; is that correct?
"A.    Yes.
"Q.    Have you talked to him as recently as Sunday?
"A.    I'm not sure if it was Sunday, but it was here recently.

38

"Q.      *Okay. Did you ever tell him that the prosecutor didn't want to hear the truth?*

"A.      *I said nobody wants to hear the truth. Everybody wants me to say what they want*
*to hear and that's what everybody want to hear."* (Emphasis added.)


Further, during Nichols' direct examination of Johnson, his client's testimony suggested Griffin was being forced to testify like the prosecutor wanted:


"Q.      Okay. And what has she told you about this case?

"A.      *That they told her they was going to charge her as accomplice if she didn't tell*
*him what they—what she wanted to hear.*

"Q.      *Okay. And when was the last time you talked to Cerrina about this case?*

"A.      Last night.

"Q.      Okay. You call her or did she call you?

"A.      No. I called her. I mean, well, she called my sister first, and my sister told me
what she told her—and she called my sister and told her that she had to say what she said
or they were going to charge her.

"MS. LIDTKE:  Objection. Hearsay.

"THE COURT:  Sustained. The jury will disregard the answer."


Nichols' decision not to introduce the telephone recordings containing information potentially harmful to Johnson—while still addressing Griffin's credibility through other means—was a sound strategic decision. We agree with the district court it thus was not constitutionally deficient performance. See *Boldridge v. State*, 289 Kan. 618, 637-39, 215 P.3d 585 (2009) (decision by counsel for murder defendant to exclude evidence of domestic abuse against her did not fall below an objective standard of reasonableness; such evidence can be a double-edged sword). Even if we assumed Nichols' failure to introduce these recordings was deficient performance, we also agree with the district court that Johnson is unable to demonstrate constitutional prejudice, *i.e.*, a reasonable probability exists the trial outcome would have been different. This conclusion is based on (1) the fact the substance of the recorded conversation was presented to the jury

39

through other means and (2) the great amount of evidence of Johnson's guilt presented at trial. See *Burnett*, 300 Kan. at 452.

Accordingly, the district court did not abuse its discretion in denying the motion for new trial based on ineffective assistance of counsel.

Issue 5: *Because there are no errors, cumulative error did not prevent Johnson from receiving a fair trial.*

Johnson argues the cumulative effect of the errors he raised above, even if independently harmless, deprived him of a fair trial. But as the State argues, and our analysis confirms, no errors were committed.

*Standard of review*

When considering the cumulative effect of errors, the reviewing court has unlimited review. *State v. Williams*, 299 Kan. 1039, 1050, 329 P.3d 420 (2014).

*Discussion*

The test for cumulative error is "'"whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under this cumulative effect rule, however, if the evidence is overwhelming against the defendant."'" *Williams*, 299 Kan. at 1050 (quoting *State v. Cruz*, 297 Kan. 1048, 1073-74, 307 P.3d 199 [2013]).

Having rejected each Johnson claim of individual error, we necessarily also reject his claim of cumulative error. See *Williams*, 299 Kan. at 1051 ("[T]here were no errors to accumulate, and [defendant's] claim of cumulative error must fail.").

Issue 6: *Johnson's Sixth and Fourteenth Amendment rights under* Apprendi v. New Jersey *were not violated when his sentence was increased based on prior criminal history.*

Johnson argues the State failed to include his prior convictions in the complaint or prove those convictions to a jury beyond a reasonable doubt under *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The State notes we have previously rejected such claims. *State v. Ivory*, 273 Kan. 44, 45-48, 41 P.3d 781 (2002).

*Standard of review*

This court exercises unlimited review over the interpretation of sentencing statutes and over constitutional questions generally. See *State v. Phillips*, 299 Kan. 479, 494, 325 P.3d 1095 (2014); *State v. Hilt*, 299 Kan. 176, 202, 322 P.3d 367 (2014).

*Discussion*

Johnson agrees with the State that this court has previously rejected his argument. See, *e.g.*, *Ivory*, 273 Kan. at 45-48; see also *State v. Fisher*, 304 Kan. 242, 264, 373 P.3d 781 (2016); *State v. Barber*, 302 Kan. 367, 386, 353 P.3d 1108 (2015). Johnson merely wishes to preserve this issue for federal review, and he offers no new argument to persuade this court to overrule this precedent. See *Barber*, 302 Kan. at 386.

CONCLUSION

The decision of the district court is affirmed.