NOT DESIGNATED FOR PUBLICATION

No. 118,395

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE INTEREST OF N.F.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Crawford District Court; LORI A. BOLTON FLEMING, judge. Opinion filed June 15, 2018. Affirmed.

*Maradeth Frederick*, of Frederick Law Office LLC., of Frontenac, and *Jason P. Wiske*, of Law Office of Jason P. Wiske LLC., of Pittsburg, for appellants.

*Michael Gayoso Jr.*, county attorney, for appellee.

Before ARNOLD-BURGER, C.J., HILL and BUSER, JJ.

PER CURIAM: Making a 5-point attack on the district court's ruling, a mother and father ask us to reverse a court's order severing their parental rights to their son, N.F. Our review of the appellate record convinces us that both parents have failed to overcome the legal presumption of their unfitness to parent because they have made little improvement during the two years the child has been out of their home. Even without this presumption, the termination of their parental rights is supported by clear and convincing evidence and is not erroneous. Because the State's motion revealed with clarity its claims of Mother's and Father's deficiencies and the scope of its attack on their ability to parent N.F., we reject their claim of a procedural due process violation. Finding no errors, we affirm.

1

*Problems with school attendance started the State's involvement.*

First, in March 2014, the State filed a child in need of care petition, alleging that N.F., born in 2004, was not attending school because of a lack of parental supervision and it was in his best interests to remove him from the home. In May, the district court ordered informal supervision to ensure that N.F. was attending school.

Later, based on the evidence of a walkthrough inspection of the home in July 2014, the State amended its petition to allege that the child was without adequate care. The State alleged that the sanitation and conditions of the home were unsuitable for children. The State also alleged Mother has a mental illness which prevents her from providing care for N.F. Mother and Father did not contest these allegations. As a result, in November, the district court found that the parents' home was not suitable for children and ordered out-of-home placement. Finally, in April 2015, the district court adjudicated N.F. as a child in need of care.

Review hearings were held in April and October 2016. At both hearings, the district court found that N.F. should remain in the custody of the Department of Children and Families and maintained that reintegration of the family was the goal. In April 2016, the district court ordered family therapy, recommended increased visits between N.F. and his parents, and found that the contractor, Kaw Valley Center, could return N.F. to the home at its discretion.

This all changed in October 2016, when the district court found that Kaw Valley Center had not made reasonable efforts to reintegrate the family. The failure occurred from August 2016 until the hearing in October. During this time, N.F. was staying at an unapproved placement, and the caseworker lied to her supervisor about N.F.'s placement. The caseworker was fired. Following this hearing, the district court continued N.F. in out-of-home placement but maintained that reintegration of the family was still the case

2

goal. About a year and a half after the child was found to be in need of care, in January 2017, the district court found that the parents needed to make more progress, but also stated that overnight visits with N.F. should begin. The visits were at the discretion of Kaw Valley Center.

With the passage of time and little or no progress being made, the State, in April 2017, moved to terminate Mother's and Father's parental rights. This was two years after the child in need of care adjudication and more than two years after the court removed N.F. from the home in November 2014.  The State alleged several statutory reasons for a finding of unfitness. These included:

- Mother's mental illness;
- drug and alcohol use by both parents;
- lack of effort to change the parents' circumstances to meet the needs of the child;
- a failure to carry out a reasonable plan directed toward reintegration; and
- other statutory factors.

The State also alleged a statutory presumption should apply here since N.F. had been placed by court order out of the home for more than two years.

For the allegation in its motion about the failure to carry out a reasonable plan directed towards reintegration, the State used the latest case plan from February 2017 as an exemplar. The State listed each permanency objective from the plan and presented factual allegations about each task. Pertinent to this appeal are the results of scheduled and unscheduled inspections of the home. These inspections occurred from January 2017 through March 2017.

*We summarize the evidence from the first day of the hearing.*

The court split the hearings on the motion to terminate between two days. The State presented its evidence on the first day. The State's evidence focused on three main areas: the completion or failure to complete the case plan tasks assigned to the parents; Mother's mental illness; and Father's lack of gainful employment.

The five witnesses for the State testified and offered their views and impressions of the parents and their home. Sara Jarrett was the assigned Department social worker to the family and began working with them in 2014. Charleen Workman, a family response advocate with the Pittsburg Police Department, started with the family in 2013 based on a referral from a school counselor. Madison Beard is a Kaw Valley Center case manager who began working with the parents in 2016. Jessica Jordan, a family support worker for Kaw Valley Center, dealt with Mother and Father beginning in September 2016. Finally, Stella Lynch was a permanency supervisor with Kaw Valley Center.

The caseworkers testified that the parents had completed some case plan tasks: (1) Mother had to take all of her medication; (2) the family was required to participate in family therapy; (3) Mother had to participate in mental health services; and (4) the parents were required to submit to random urinalysis screenings.

Yet, the parents did not complete these case plan tasks: (1) provide a stable house and utility receipts; (2) Father must obtain employment; and (3) make necessary repairs to the house.

One case plan task was completed with one exception. The parents were not to have anyone living at the house that could not pass a KBI background check. The parents allowed their older son to stay at the house after he was released from custody in Washington. He lived with them from November 2016 until late January 2017.

4

The State presented details about the failure to complete some case plan tasks. The State presented evidence from walkthroughs of the home conducted between 2014 and 2017. Mother objected to the evidence of any walkthroughs before January 20, 2017, because they were not included in the factual allegations within the motion to terminate parental rights. The district court overruled the objection.

The first walkthrough inspection occurred after the State amended its initial child in need of care petition. During this walkthrough, Jarrett observed clothes and clutter scattered about the home. Jarrett performed a second walkthrough and stated that the conditions had worsened. It is not clear from the record when this walkthrough occurred. The other walkthrough inspections, which occurred from September 2016, until March 2017, were performed by three caseworkers—Beard, Jordan, and Lynch.

In September 2016, Jordan inspected the home and observed:
- an animal had entered the home;
- Jordan had to kick through trash at the door to get into the house;
- the entry way smelled like cat urine;
- there was cigarette smoke in the living room;
- there was accumulated clutter in the home;
- the floors were not swept;
- the garbage had not been disposed of properly;
- there were roaches;
- the daughter's room was being remodeled, so the furniture from that room was in the living room;
- clothing had not been laundered;
- there were flytraps hanging from the ceiling with dead flies;
- the countertops in the kitchen were cluttered;
- an odor was coming from the refrigerator;

5

- the kitchen windows had no screens; and
- that there was no heating in the home, but Jordan remarked that it was not yet needed at the time of her visit.

Next, in October 2016, Jordan participated in the next inspection. She testified that:

- the garbage still had not been disposed of properly;
- the dishes had not been washed;
- there was an odor coming from the refrigerator caused by rotting onions and spoiled milk;
- a litterbox was full and had an offensive odor;
- the bathroom was not in good shape and it had a foul odor;
- the kitchen window screens had not been fixed; and
- clothing was unlaundered.

Jordan was not allowed into Mother's bedroom because Mother claimed it was her personal space.

Lynch also participated in this inspection. While outside the home, she observed:

- an accumulation of trash on the side of the house;
- the grass had grown waist-high;
- one of the windows was broken;
- some windows also lacked screens;
- some screens had holes.

Inside the house, Lynch observed similar issues as Jordan. Lynch did not enter the parents' bedroom, but stated there was a bed, dresser, and accumulation of several unidentified items inside.

Two days later, Jordan made a follow-up visit. She testified that the parents had made progress:

- The dishes and refrigerator had been cleaned;
- the bathroom was in a better condition, but still needed work;
- the handle on the toilet had broken and a wrench was used to flush the toilet; and
- the laundry still had not been done.

Beard also participated in this walkthrough. She stated that progress had been made and she only had a few concerns. Her biggest concerns were that the parents did not provide any rent or utility receipts and there were flies and gnats in the house.

Later that month, Jordan made another visit. In her opinion, many things had improved and the parents had worked on the home. Still, the roof leaked because it had not been repaired. The refrigerator needed cleaning, but it passed the inspection. The clothes had not been laundered and the litterbox was not clean. And Jordan stated that there was an issue with the heating—the heater was outside and a pipe ran outside a window.

In November 2016, Jordan made another inspection. She had been informed that the utilities were not working. At the walkthrough, the parents did not provide a receipt for the utilities. In Jordan's opinion, there were still major issues with the home, but the parents had worked on individual issues that Jordan had addressed with them.

Lynch stated that she was told the parents were past due on their utilities payments. Indeed, Mother testified that this was true. The parents planned on using their tax refund to pay off their past due balances.

During an inspection in January 2017, Beard observed that the carpets were soiled and there were cigarette butts on the floor. Food was improperly stored and the refrigerator still needed to be cleaned. She tried to make another inspection in February 2017, but cancelled after Mother called and told her of a bedbug infestation. A pest control company assessed the bed bug infestation and tried to remedy the problem. A second treatment was scheduled for March 2017.

The day before the second pest treatment, Beard made another inspection of the home. When she entered the home, she smelled cigarette smoke and believed that Mother had been smoking in the house. Beard stated that there was garbage everywhere. One of the family's dogs had defecated in the parents' bedroom and it was not cleaned up. To heat the house, Mother had placed a fan over the open door of the oven that was turned on. And the dishes were dirty. Beard discussed these issues with Mother and described what needed to be done. Mother stated that because of her depression and bipolar disorder it was difficult for her to leave her room. Beard believed that Mother had cleaned up the house before the second bedbug treatment the next day.

*We summarize evidence from the second day.*

The parents presented evidence about the condition of the home at the second hearing. James Orwig, the parents' therapist, stated he had been at the home recently and it was in good condition. And he thought that the deterioration of the home in January 2017 was because of the parents' older son living at the home.

Orwig testified about Mother's mental illness. He stated that Mother had severe anxiety about her children. He engaged in therapy with Mother and she had improved through this therapy and was more confident about being in public.

8

Orwig also testified that Father had trouble obtaining employment because of a lack of transportation. Father was fired from Masonite in November 2016. Father began working part-time for a lawn care business about three or four weeks before the July 2017 hearing. Mother stated that Father began doing the lawn care work the day after the previous court hearing. Between being fired from Masonite and beginning the lawn care work, Father was unemployed but had tried to obtain employment.

Mother testified and agreed with the State's assertion that the home was not fit for children. But she never planned to have her child return to the house. Instead, she wanted N.F. back in her custody and they would move temporarily to Arma so N.F. could continue at his current school. Later, they would move to Joplin so she could work in a rehab center. She stated that she and Father had not moved to Arma because they could live in the current home rent-free since it was owned by Father's parents.

*The State focused on the parents' failures to complete the case plan.*

The State alleged the parents failed the case plan task to repair their home to make it suitable for children. Although the parents had made some repairs, there was mold in their daughter's bedroom walls and they worked on fixing that issue. Additionally, when they had bedbugs, the house was treated by an exterminator. However, throughout the case the roof had a leak that was not repaired.

Over the objection of both Mother and Father, Workman testified for the State about Mother's mental illness. Mother told Workman about having social phobia, which made it difficult for her to leave the house, and depression, which made it difficult to clean the house. Workman provided one example in which Mother had an anxiety attack while grocery shopping. Workman also assisted the parents with housecleaning. When Mother had anxiety attacks, Workman tried to make her comfortable. The only other evidence the State presented about Mother's mental illness was her statement to Beard

9

about having difficulty with cleaning the house because of her bipolar disorder and depression.

One of the case plan tasks was for Father to obtain employment. Father was employed at Masonite, but was fired. He did provide some paystubs to a caseworker. He also worked on cars for extra cash. After Father was fired, Kaw Valley Center provided some help by sending him text messages about potential jobs.

*The district court held the parents to be unfit.*

The district court determined the State had shown that the parents were unfit, their unfitness was unlikely to change in the foreseeable future, and termination of the parental rights was in the best interests of N.F. In reaching this conclusion, the district court applied two statutory presumptions of unfitness—K.S.A. 2017 Supp. 38-2271(a)(5) and (6). Under subsection (a)(5) the district court found N.F. had been placed out of the home for more than *one* year and the parents had failed to carry out a case plan adopted by the court in two ways. First, the parents failed to keep the home in an acceptable condition, and second, Father had not satisfied the employment requirement of the case plan. Under subsection (a)(6), the district court found that N.F. had been out of the home for more than *two* years, the parents had failed to carry out their case plan, and there was a substantial probability that the parents would not fulfill the plan in the foreseeable future.

After applying these statutory presumptions, the district court followed the law and looked to the parents to rebut the presumptions. It found that the parents did not present evidence that the home was now suitable. In reaching this conclusion, in addition to the extensive evidence presented by those who inspected the home, the court relied on Mother's own admission that the house is unfit for children.

And the court found that there was no plan for employment by Father. The district court also found that the parents were unfit, even without applying any presumption, based on various statutory factors. Having found that there was unfitness by the parents unlikely to change in the foreseeable future and that termination was in the best interests of N.F., the district court terminated Mother's and Father's parental rights.

*What we must consider in this appeal.*

In their brief seeking reversal, the parents raise five concerns.

- The State presented insufficient evidence of their unfitness to support the court's conclusion;
- by fulfilling their case plans, they had rebutted the statutory presumptions applied by the court;
- even if the presumptions apply, there is no evidence that it is in N.F.'s best interests to sever their parental rights;
- the court erred by not granting them an agreed continuance of the hearing after Father's mother was hospitalized; and
- the court erred by admitting evidence of events outside the dates specified in the State's motion—from January 2017 through April 2017.

We will take up the issues in that order.

*There is ample evidence of unfitness in this record.*

In ruling on such questions we are required by law to review all the evidence in the light most favorable to the State. If we are convinced that a rational fact-finder could have found it highly probable, that is, by clear and convincing evidence that the parents' rights should be terminated, we will affirm. We will not weigh conflicting evidence, pass

11

on witness credibility, or redetermine questions of fact. See *In re B.D.-Y.* 286 Kan. 686, 705, 187 P. 3d 594 (2008).

We will not recount all the testimony produced in these long hearings but we can reveal our general impressions gained from our review of the record on appeal. Generally, beginning with concerns about school attendance and then issues of care and neglect, along with problematic home conditions, the State intervened in N.F.'s life by filing a child in need of care petition. After a period of fact-finding, the court adjudicated N.F. as a child in need of care and exercised its jurisdiction by removing him from the sorry conditions it had found him in. Then, for over two years he lived outside the home. The court gave Mother and Father, with the help of various social services, a period to put things back together.

Unfortunately, things did not work out. Mother and Father did make some improvements but not enough to merit the return of their son. Some progress was made, then things would fall apart again at home. There is no evidence of any consistent improvement in the living conditions in the parents' home. For the entire time it remained unfit for a child to live in.

If there was any evidence in the record that would nourish a belief that things were getting better for these parents, our ruling would be different. After all, reunification of the family is most often the best goal in such cases. But sending a child back into abominable conditions is not in a child's best interests.

In a real way, the district court had to answer the question, how much longer is it going to take? Will another year of out-of-home placement do? Perhaps, two years? A fair reading of this record discloses that very little, if any, progress was made in improving this family's home conditions in the two years N.F. was out of the home.

Frankly, there is no evidence in this record that could lead any fact-finder to believe that a positive, nourishing, environment for a child was being built by Mother and Father.

Even Mother candidly admitted that their home was improper for a child, but even so, she offered the court no realistic plan for either changing her ways or her environment. Father, fired from his last employment, made a few dollars mowing lawns and repairing some cars. But again, like Mother, he offered the court no real plan for improvement of his circumstances that could help create a safe, fit home for his son.

A quick review of the various points of the latest case plan adopted by the district court and the lack of progress reflects our concerns. From the plan adopted by the court on February 21, 2017:

- Mother will continue to participate in mental health services. She did this.
- Mother and Father will submit to random drug tests, which must be negative to allow visitation with N.F. They did this.
- Mother and Father will not have anyone in the home that could not pass a KBI and CANIS record check. They failed this task when they permitted an older son, on parole from Washington, to stay with them. Their own witness testified that his presence was one significant factor in the amount of trash and clutter in the home. After complaints from the social service agencies, they no longer allowed him to live with them.
- Mother and Father will allow scheduled and unscheduled inspections of their home. They complied with this. But the inspection evidence consistently showed that the house was unfit for children.
- Mother will continue taking her medications. She did this.
- Mother and Father will maintain stable housing and provide utility receipts to Kaw Valley Center monthly. They failed this task. They were overdue on

13

payment of utilities and have not provided any receipts to Kaw Valley Center.

- Father will obtain legal income. He failed at this. He made no significant progress in obtaining work income that would sustain his family. He offered no plan for any chance of improvement on this point.

- Mother, Father, and N.F. will participate in family therapy and follow the therapist's recommendations. The family continues to participate in family therapy once a week.

- Father and Mother will make all necessary repairs to the home. Some were made but the house continued to be unfit for a child.

We applaud the efforts of Mother and Father for the steps they did take to improve their situation. But considering their environment and the needs of their child, overall, they were not enough. This is what the district court recognized.

After viewing this evidence in the light most favorable to the State, we hold that there is sufficient evidence in this record to uphold the findings of the district court. There is clear and convincing evidence of unfitness.

*The parents did not rebut the presumptions of unfitness.*

A court may presume a parent is unfit in some cases. Two statutes—K.S.A. 2017 Supp. 38-2271(a)(5) and (6)—call for such a presumption if the child has been placed by court order out of the home for 1 year ([a][5]) or 2 years ([a][6]). The requirements differ somewhat. For the (a)(5) presumption to apply there must also be proof the parent has *substantially neglected or willfully refused* to carry out a reasonable plan approved by the court toward reintegration of the child with the family. But under (a)(6) along with proof of out-of-home placement for two years there must also be proof that the parent has failed to carry out a reasonable plan approved by the court and there is substantial probability

14

that the parent will not carry out such a plan in the near future. The district court ruled that both these presumptions apply.

After our review of the record we cannot agree with the parents' wishful thinking that they complied with the case plan. Indeed, they did comply with some requirements but not all—some of which were the most fundamental of requirements. They never provided a safe and sanitary home for their child to live in. To paraphrase the district court, just because they had little money that does not mean they have to live in unsanitary conditions. They also made no progress in securing gainful employment. Once the burden shifted to them, under the statute, the parents needed to show evidence of fitness. They did not. See *In re X.D.*, 51 Kan. App. 2d 71, 74-75, 340 P. 3d 1230 (2014).

*There is no abuse of discretion in the ruling on the best interests of N.F.*

After finding the parents unfit, the next consideration for the court was whether it was in the child's best interests to terminate parental rights. See K.S.A. 2017 Supp. 38-2269(g)(1). Just because a court finds that the parents are unfit, it does not automatically follow that it is in the best interests of a child to terminate his ties with his parents. After all, human beings are emotional creatures and severance can sometimes inflict emotional trauma on a child. See *In re K.R.*, 43 Kan. App. 2d 891, 903-04, 233 P. 3d 746 (2010).

When looking at the best interests of the child, a district court is in the best position to make that determination. Thus, we do not disturb the district court's finding unless the district court abused its discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). A court abuses its discretion when the decision is (1) arbitrary, fanciful, or unreasonable—meaning no reasonable person would take the view adopted by the district court; (2) based on an error of law; or (3) based on an error of fact. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017). Because we see no error of law or fact, we look to the first option. Would no reasonable person take the view

15

adopted by the district court here? In our view, a reasonable person would take the same view as the court did here.

Essentially, Mother and Father contend that since no professional witness offered an opinion that it is in the best interests of N.F. that his parents' rights be terminated, then the court abused its discretion. Indeed, none of the State's witnesses offered such an opinion and the judge did not make many comments about this question.

But we recognize both the judgment the court was making and the competing forces of possible rehabilitation of the family versus a possible long-term placement of the child in a loving, safe, secure, and sanitary home at play here. A reasonable person could agree that the court's decision was proper as it was time to give N.F. a chance at a better life in a permanent placement as opposed to the legal limbo of out-of-home placement in various foster care homes while the years roll by, waiting for Mother and Father to provide a proper home for him someday.

We find no reason to reverse the district court on this point.

*There is no abuse of discretion in not continuing the second day's hearing.*

Before the second day of hearing on the motion to terminate parental rights, Mother and Father moved to continue the hearing. Father's mother was in a coma. The parents argued that terminating parental rights on that day would affect N.F. because he had been living with her. The State and the guardian ad litem consented to the continuance if terminating parental rights would have a traumatic effect upon N.F. because of his grandmother's illness. The district court denied the request for a continuance and found that the further delay in reaching permanency would have a greater harmful effect on N.F. than the termination.

16

The decision to grant or deny a continuance is within the discretion of the district court. Thus, we review the denial of a continuance for an abuse of discretion. *State v. Johnson*, 304 Kan. 924, 944-45, 376 P.3d 70 (2016). The party asserting an abuse of discretion bears the burden of proving that the district court abused its discretion. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

We recognize that a proceeding under the Code for the Care of Children must be disposed of without delay, but continuances may be granted when the party requesting the continuance shows good cause. See K.S.A. 2017 Supp. 38-2246. The Code establishes the time for a hearing on a motion to terminate parental rights, and it limits the grant of continuances—"[a] continuance shall be granted only if the court finds it is in the best interests of the child." K.S.A. 2017 Supp. 38-2267(a).

Here, the court's decision was reasonable based on the standards required by the Code. N.F. had been placed out of the home for more than two years. And the court found that N.F. had not recently resided with his paternal grandmother. The consideration of a further delay upon N.F. is reasonable based on the requirement to dispose of the case without delay. See *In re J.A.H.*, 285 Kan. 375, 386, 172 P.3d 1 (2007). While Mother and Father considered grandmother's illness to be a good cause for a continuance, they failed to show that it was in N.F.'s best interests to continue the hearing. Based on the argument presented to the district court, a reasonable person could either have granted or denied the continuance. When a reasonable person could take the action of the district court, there is no abuse of discretion.

Additionally, the parents argue that the continuance should have been granted to allow Father to testify because he could not testify at the hearing because he was too distraught over his mother's condition. It is true that Father did not testify at the hearing

17

on the termination of parental rights. But Father did not argue to the court that a continuance should be granted to permit him to testify.

Simply put, the parents do not meet the burden to show that the district court abused its discretion. The decision that an indefinite delay in the proceedings would not be in N.F.'s best interests was reasonable based on this record.

*We are unpersuaded by the parents' due process claim.*

The parents contend that the court denied them due process when over their objection, it admitted evidence of their acts, omissions, and home conditions outside the period of January 2017 to April 2017. Those are the dates specifically mentioned in the State's motion to terminate. They cite K.S.A. 2017 Supp. 38-2266(b) for support. In their view, the court should have limited the State to evidence only from that period. And the evidence concerning Mother's mental health should have been so limited. Instead, again over their objection, the court admitted testimony about mother's mental health in 2014. They couch their argument in terms of "proper notice."

The statute—K.S.A. 2017 Supp. 38-2266(b)—directs that when a pleading is filed which requests the termination of parental rights, it shall contain a statement of specific facts which are relied on to support the request. This includes dates, times, and locations if known.

The topics which were the focus of the State's motion are clear:
- The abominable condition of their home;
- Mother's mental health problems;
- Father's lack of gainful employment;
- the extended period of out-of-home placement of N.F.;
- the failure to comply with the latest case plan; and

18

- their failure to change their conduct and circumstances.

When we examine the State's motion, we note that almost immediately the State alleges that "with respect to the mother, emotional illness, mental illness, mental deficiency, or physical disability of the parent *of such duration or nature* as to render the parent unable to care [for] the . . . needs of the child." (Emphasis added.) This allegation puts Mother on notice that this was an issue the State intended to raise. We find that the court properly overruled her objection to this evidence. In another section of the motion the State alleges that the parents have failed "to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child." And the motion advises that Father is unemployed, not qualified for unemployment compensation, and despite reports from Mother that he has found work, he has failed to provide employment verification, but works on cars for cash. And in another section, the child has been in out-of-home placement as a result of their actions or inactions. In our view, this puts the parents on notice that all the evidence arising while the child has been outside the home is material and admissible.

The specific dates mentioned by the parents are about a case plan used as an exemplar by the State in its motion. We know of no rule that limits the State's ability to present evidence about the failures of the parents to meet prior case plans. Such motions cover a range of time. Here, it is the period when N.F. has been outside the home.

The parents claim a notice violation. But we ask, what is the prejudice here? The parents have presented no argument about how this harmed their case. Much damaging evidence against them was admitted but surely they knew it was coming. After all, they lived in that house the entire time. Mother admitted it was unfit for a child and they only lived there because it was rent free.

19

We agree with the panel's holding in *In the interest of K.H.*, No. 106,322, 2012 WL 687975, at *7 (Kan. App. 2012) (unpublished opinion), when it said that a "motion for termination of parental rights may sufficiently meet a parent's due process rights if the motion gives the parent adequate notice and an opportunity to be heard to defend against the State's claims." That is what the State's motion here did.

There is no reversible error here.

Affirmed.