NOT DESIGNATED FOR PUBLICATION

No. 119,226

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LARRY D. EDMOND,
*Appellant,*

v.

STATE OF KANSAS,
*Appellee.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed December 13, 2019. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant, and *Larry D. Edmond*, appellant pro se.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., MALONE and POWELL, JJ.

PER CURIAM: In 2012, Larry D. Edmond was convicted of attempted second-degree murder, aggravated kidnapping, robbery, and aggravated battery. This court affirmed his convictions on direct appeal. *State v. Edmond*, No. 109,617, 2014 WL 2402001 (Kan. App. 2014) (unpublished opinion). Edmond filed a K.S.A. 60-1507 motion arguing that the trial court erred in admitting evidence and also arguing ineffective assistance of trial counsel. The district court summarily denied part of the motion and denied the remainder after a preliminary, nonevidentiary hearing. Edmond

1

appeals, arguing that he was entitled to a full evidentiary hearing on his claims. For the reasons explained in this opinion, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In affirming Edmond's conviction, this court summarized the facts in Edmond's case:

"On October 10, 2011, Edmond and other individuals took keys from an acquaintance, Danny Hendricks, and left in Hendricks' truck. Hendricks testified that he did not report the robbery because he was afraid and only wanted to regain possession of his vehicle. Six days later, on October 16, 2011, Hendricks attempted to recover the truck from an apartment complex.

"When Hendricks went inside one of the apartment buildings, he heard a 'bunch of ruckus' upstairs, but a relative of Edmond's kept Hendricks from accessing the stairwell. A group soon exited the stairwell which included Edmond; Edmond's sister, who was a resident of the apartment complex; and Tracey Williams, who was Edmond's girlfriend.

"Williams was surrounded by the group and, according to Hendricks, she appeared to have been severely beaten. Edmond and the others essentially dragged Williams to Hendricks' truck. They placed Williams inside the vehicle between Edmond, who was driving, and Edmond's cousin, who sat in the passenger seat.

"Edmond drove away and Hendricks was unable to follow the vehicle. Hendricks drove to Edmond's residence, where Edmond later arrived. Williams was still inside the truck, and Hendricks again observed that she had been severely beaten. Hendricks witnessed Edmond strike Williams in the mouth before he entered the residence, leaving Williams behind.

"Hendricks approached the truck and spoke with Williams. She said she was beaten at the apartment complex and then taken in the truck to a place near a river, where she was beaten again. Williams told Hendricks that Edmond choked her to the point of blacking out and that she had 'soiled herself.' Hendricks noticed his truck was muddy and that Williams smelled 'pretty . . . bad, . . . almost like urine, sweat, everything.'

"Edmond soon stepped outside and told Hendricks to take Williams. Edmond exclaimed, '[T]hat's what happens when somebody crosses [me].' Williams asked Hendricks to take her to a friend's home to change her clothing. Williams then called her ex-husband and asked to borrow clothing belonging to their daughter. Upon her arrival with Williams, the ex-husband noticed Williams' pants were wet. According to his testimony, Williams said she had 'got into it with her boyfriend,' and had 'messed her pants up and she needed to change.'

"Hendricks and Williams decided to report the crimes against them to law enforcement. After Williams had changed, they went to the police station and made reports. The two then went to the residence of Williams' mother, Dorothy Fields, where Williams was also living.

"Fields testified that she barely recognized her daughter. When she asked Williams who was responsible, she responded, "'You know'" and, after further questioning, "'Larry.'" Fields understood that Williams was referring to Edmond. Williams refused to say anything more about the incident. She went to bed, but in the morning her mother was unable to awaken her. Fearing Williams was dead, Fields called 911.

"Williams was transported to the hospital, where she told Debra Hermes, a physician's assistant, that her boyfriend had 'forced [her] into a truck[,] . . . taken [her] to a creek, . . . held [her] against her will for four hours, and . . . beat [her] up during that time and choked [her].' Williams said she reported the incident to the police, but 'the officer that initially interviewed her was not very nice and that they didn't seem to be very caring.'

"Hermes testified that Williams had swollen lips, swelling around both of her eyes, bleeding in her right eye, abrasions and bruising on the front of her neck, bruising over her chest, and tenderness over her abdomen. Although Williams specifically reported her boyfriend had struck her in the mouth and it 'felt like her teeth were pushed up into her gums,' she was in 'so much pain and discomfort that she couldn't tolerate' an examination of her mouth. According to Hermes, a physician remarked about the evident violence of the beating, and both medical personnel were surprised when tests showed no broken bones.

"Williams telephoned Detective Benjamin Jonker the next day and complained that Edmond should have been arrested for kidnapping as well as domestic violence. The detective examined the desk officer's report, which indicated that Edmond had beaten and

3

choked Williams but did not mention that she was taken against her will. Detective Jonker scheduled a formal interview with Williams.

"As part of his investigation, Detective Jonker went to the apartment complex and met with the property manager to review surveillance videotapes. One videotape showed Williams and Edmond leave an apartment on the second floor of the building and remain in the corridor, where Edmond's sister and one or two individuals joined them. The manager testified '[i]t was obvious that there was some [sort of] confrontation' occurring.

"The surveillance videotape showed Williams and Edmond then leave the corridor and enter the stairwell. Edmond's sister glanced inside the stairwell, but she and the others remained in the corridor. When a resident tried to enter the stairwell, those individuals in the corridor prevented it. The videotape also showed that about 3 to 4 minutes later, Edmond's sister and the others entered the stairwell, and Edmond, Williams, and the rest exited on the lower level. The videotape did not show anyone strike Williams, and it did not show if Williams had any injuries.

"Another surveillance videotape was similar, showing Edmond grab Williams by the arm and pull her towards the stairwell. Yet another videotape showed Edmond and Williams standing near the door to the stairwell, with Williams against a wall and Edmond standing in front of her. Detective Jonker testified that it appeared they were having a 'heated conversation.' Williams was shaking her head, and when she attempted to walk away, Edmond grabbed her arm and 'yank[ed] her into the stairwell area.'

"One videotape showed Hendricks 'just sort of milling around on the first floor' during these events. As the group exited the stairwell, Hendricks 'tail[ed] behind' them. Detective Jonker testified he was unable to obtain a copy of the surveillance videotapes before they were recorded over and, as a result, they were not shown to the jury.

"Detective Jonker interviewed Hendricks, who said Edmond was intoxicated on October 16, 2011. Williams also confirmed that Edmond was intoxicated. Williams said Edmond had suspected her of taking money, and that Edmond's sister was 'basically egging [him] on, saying, "She took your money. She took your money."' Williams said the confrontation at the apartment complex related to this money, and that Edmond's sister warned him not to hit her in the hallway due to the security cameras.

"Williams told the detective that once she and Edmond were out of the cameras' view, he started '"wailing on [her],"' causing her to lose consciousness several times. Williams said individuals were standing guard at either end of the stairwell to prevent

4

witnesses. When these individuals thought they heard an elevator, Edmond's sister told Edmond to take Williams outside. They all then went to Hendricks' truck.

"Williams said that after Edmond's cousin had left the truck, Edmond told her: "'You're going to die tonight.'" Edmond drove to the dead end of a dirt road along a river and asked Williams again about the money, struck her, and repeated that he was going to kill her. Edmond placed both of his arms around Williams' neck and started to strangle her. According to Detective Jonker, Williams was 'very vivid in her description' of the strangulation:

'[Williams] said that she felt like her eyeballs were going to pop out of her head. And then she says she loses consciousness. Again, going back to the questions that we typically ask on strangulation cases, I asked her if she had urinated or defecated on herself, and she says during the interview that she did both, and that she was actually washing the clothes as I was speaking to her. She said that when she came to, she felt like she was crying, and she reached up and tried to wipe the tear away and realized it was her eye that was actually bleeding.'

"Williams told Detective Jonker that she continued to plead that she had not taken Edmond's money. Edmond hit Williams again and blood landed on him as it sprayed from her mouth. Williams said Edmond finally drove back to his residence.

"The State charged Edmond with attempted first-degree murder . . . , aggravated kidnapping . . . , robbery . . . , and aggravated battery . . . .

"While Edmond was incarcerated awaiting trial, Edmond and Williams spoke by telephone. The jailhouse conversations were recorded, and Detective Jonker concluded from them that Edmond and Williams were conspiring to 'make these charges go away.'

"The State played portions of the jailhouse telephone conversations for the jury. They begin with Williams' repeated, reproachful complaints to Edmond about her injuries. The conversation [then] turned to the cause of the injuries. Edmond told Williams the incident had occurred on the fourth floor of the apartment building, and when Williams corrected him, Edmond cursed and said, "'You got to get this straight.'" The two continued to talk in an insinuating manner about how Williams "'got into it with'" a woman prior to arriving at the apartment complex. Edmond suggested that Williams tell law enforcement officers and the district attorney's office that she 'was on drugs for 3 to 4 days, she doesn't remember much of anything[, and] [w]hat she does remember was [Edmond] was trying to help her and get her out of there.' Williams was heard worrying aloud that she was 'going to have to basically get in trouble for lying.'

5

"Williams did, in fact, eventually tell the detective 'she had lied about everything,' and that she did not wish to testify at Edmond's preliminary hearing. Williams did testify at the preliminary hearing, but she recanted her earlier statements incriminating Edmond. Subsequently, the State was unable to locate Williams and she did not appear as a witness at Edmond's jury trial.

"At the jury trial, the trial court found that Williams was an unavailable witness. As a consequence, the trial court admitted a redacted transcript of her preliminary hearing testimony into evidence. This testimony provided an exculpatory version of events similar to that discussed in the jailhouse telephone conversations. This testimony was also contrary to the incriminating accounts Williams initially related to Hendricks, her ex-husband, her mother, medical personnel, and law enforcement officers.

"In his defense case, Edmond called as his sole witness, Officer Joletta Vallejo, the desk officer who had taken Williams' initial report. Officer Vallejo recalled Williams' account that 'she and [Edmond,] her boyfriend[,] got in an argument about money, and that he had punched her several times and . . . choked her.' The officer had noted 'minor injuries' on Williams' face, specifically 'two bumps' around her eye and swelling about her lip. Officer Vallejo said she took photographs of the injuries and offered to contact emergency medical services, but Williams refused the offer of assistance. The officer recalled telling Williams that Edmond would be arrested for domestic violence.

"The jury returned guilty verdicts on attempted second-degree murder . . . , aggravated kidnapping . . . , robbery . . . , and aggravated battery . . . . Edmond was sentenced to 586 months' of imprisonment." *Edmond*, 2014 WL 2402001, at *1-4.

Also, related to some of Edmond's claims in his K.S.A. 60-1507 motion, at a preliminary hearing on August 13, 2012, the State moved to endorse Fields based on her contact with Williams after the incident happened. The State also moved to endorse Jessica Tobias, the nurse who saw Williams and discussed the incident with her, and Cory Rodivich, a crime scene investigator who did a presumptive test for blood in Hendricks' truck. The district court granted the motion for late endorsement of Tobias, Fields, and Rodivich. At trial, the State clarified that it had misread the medical record and the nurse they were calling was Debra Hermes not Jessica Tobias. Trial counsel objected, but the district court allowed the endorsement.

On direct appeal, Edmond argued the district court should have declared a mistrial because of the jury's possible racial bias towards him based on his use of the word "peckerwoods" in one of the jailhouse phone calls and the further discussion of the meaning and significance of the word by Jonker. *Edmond*, 2014 WL 2402001, at \*5. This court found that the district court reasonably refused to characterize the testimony as a fundamental failure in proceeding and this court "agree[d] with the trial court that the meaning of the term is not commonly known or generally understood to be particularly offensive in a racial context." 2014 WL 2402001, at \*6.

Edmond also argued on direct appeal that the district court erred in finding Williams unavailable as a witness at trial and admitting her preliminary hearing testimony. 2014 WL 2402001, at \*10. This court found no error and agreed with the district court that it was permissible to admit Williams' preliminary hearing testimony because she was unavailable at trial. 2014 WL 2402001, at \*11. Edmond also argued that the admission of Williams' statements through Hermes, Fields, and Jonker was hearsay and violated the Confrontation Clause of the United States Constitution, but this court found that Edmond failed to preserve this claim by objecting at trial. 2014 WL 2402001, at \*11. Ultimately, this court affirmed Edmond's convictions. 2014 WL 2402001, at \*12. Our Supreme Court denied Edmond's petition for review on June 30, 2015.

On June 16, 2016, Edmond filed his pro se K.S.A. 60-1507 motion and memorandum in support. In his motion, Edmond argued: (1) the trial court erred in ruling that Williams was unavailable to testify at trial; (2) the trial court erred in admitting hearsay statements of Williams; (3) ineffective assistance of trial counsel based on his failure to object to hearsay testimony, failure to impeach, failure to object to late endorsement of witnesses, failure to investigate, and failure to call certain witnesses; and (4) the trial court violated his speedy trial rights. On August 16, 2016, the district court issued an order summarily denying portions of Edmond's motion. The district court found that this court had addressed three of Edmond's claims—that the trial court erred in

determining Williams was unavailable, that the trial court erred in admitting hearsay statements, and that trial counsel was ineffective for failing to object to the hearsay testimony of Williams—in his direct appeal. Thus, the district court found the doctrine of res judicata prevented Edmond from raising these issues again. The district court set the remainder of Edmond's claims for a preliminary hearing.

On June 14, 2017, the district court held a preliminary, nonevidentiary hearing on the remainder of Edmond's ineffective assistance of counsel claims and his speedy trial claim. The district court denied each of Edmond's remaining ineffective assistance of counsel claims. Specifically, the district court denied Edmond's claim that his trial counsel was ineffective for failing to impeach Hendricks because it found that Edmond suffered no prejudice. The district court denied Edmond's claim that his trial counsel was ineffective for failing to object to the late endorsement of Fields and Hermes because Edmond presented no evidence to show that he was surprised or unprepared to respond to Fields and trial counsel did object to the endorsement of Hermes. The district court denied Edmond's claim that his trial counsel was ineffective for failing to investigate and call certain witnesses because determining which witnesses to call and what defense to present were strategic decisions reserved for trial counsel. The district court also denied Edmond's claim that the trial court erred in denying his speedy trial claim, finding it was a trial error that Edmond should have raised on direct appeal. On July 21, 2017, the district court issued an order denying Edmond's motion.

Edmond now appeals, arguing that the district court erred in denying his motion without an evidentiary hearing. Both parties timely filed briefs. Edmond also filed a pro se supplemental brief raising additional claims of ineffective assistance of trial counsel and also raising claims of ineffective assistance of appellate counsel and ineffective assistance of K.S.A. 60-1507 counsel.

Edmond argues that the district court erred in denying his motion without an evidentiary hearing because he presented a factual and legal basis for his claims that trial counsel was ineffective for failing to impeach Hendricks, failing to object to the late endorsement of Fields and Hermes as witnesses, and for the cumulative effect of five other errors. In his pro se supplemental brief, Edmond argues that his trial counsel was ineffective for failing to object to hearsay and Confrontation Clause violations caused by the admission of Williams' out-of-court statements, and he raises several new claims of ineffective assistance of trial counsel. Edmond does not renew his claim that the trial court violated his speedy trial rights. An issue not briefed is deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018).

*Preservation*

To begin with, Edmond's pro se supplemental brief raises multiple claims of ineffective assistance of trial counsel for the first time on appeal. Edmond concedes that he raises many of his claims for the first time on appeal, but he argues—in one sentence of his brief—that we should address his claims to serve the ends of justice because he filed his K.S.A. 60-1507 motion pro se in district court. We reject Edmond's assertion that we should address his new claims of ineffective assistance of trial counsel for the first time on appeal to serve the ends of justice. Nor has Edmonds properly asserted that we should remand this case to the district court to hear his claims of ineffective assistance of trial counsel raised for the first time on appeal under *State v. Van Cleave*, 239 Kan. 117, 119-20, 716 P.2d 580 (1986).

Thus, the only issues properly before this court are whether trial counsel was ineffective for: (1) failing to impeach Hendricks; (2) failing to object to the late endorsement of Fields and Hermes as witnesses; (3) the cumulative effect of five other

errors; and (4) failing to object to hearsay and Confrontation Clause violations caused by the admission of Williams' out-of-court statements. We will address these claims in turn.

*Standard of review*

A district court has three options when handling a K.S.A. 60-1507 motion:

> "'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citation omitted.]" *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014).

When the district court denies the motion "based only on the motion, files, and records after a preliminary hearing," the standard of review is de novo. *Grossman v. State*, 300 Kan. 1058, 1061, 337 P.3d 687 (2014). "'A movant has the burden to prove his or her K.S.A. 60-1507 motion warrants an evidentiary hearing; the movant must make more than conclusory contentions and must state an evidentiary basis in support of the claims, or an evidentiary basis must appear in the record.'" *Sola-Morales*, 300 Kan. at 881 (quoting *Holmes v. State*, 292 Kan. 271, 274, 252 P.3d 573 [2011]).

Edmond's claims are based on ineffective assistance of counsel. The Sixth Amendment to the United States Constitution, as applied to the states under the Fourteenth Amendment, guarantees that in criminal prosecutions the accused has the right to effective assistance of counsel. *Sola-Morales*, 300 Kan. at 882. An ineffective assistance of counsel claim based on deficient performance is subject to the *Strickland* test. 300 Kan. at 882 (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80

10

L. Ed. 2d 674 [1984]). The *Strickland* test requires Edmond to show that (1) the performance of trial counsel was deficient and (2) the deficient performance prejudiced him, "*i.e.*, that there is a reasonable probability the jury would have reached a different result absent the deficient performance." See 300 Kan. at 882; see also *Strickland*, 466 U.S. at 687. In analyzing a claim of ineffective assistance of counsel, there is a strong presumption that counsel's conduct was adequate and that counsel made decisions within the exercise of reasonable professional judgment. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014).

*Was trial counsel ineffective for failing to impeach Hendricks?*

Edmond argues that there were six inconsistencies between Hendricks' pretrial statements and his testimony at trial and that his trial counsel failed to impeach Hendricks on cross-examination. Edmond then cites caselaw, mostly from other jurisdictions, that establishes what impeachment is, the impeachment process, and its importance.

Generally, the decision on whether and how to cross-examine a witness is a strategic decision left to counsel. *Sola-Morales*, 300 Kan. at 887. Strategic choices made after a thorough investigation of law and facts are virtually unchallengeable. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013). Edmond bears the burden of showing trial counsel's alleged failure to impeach Hendricks did not result from strategy. See *State v. Johnson*, 304 Kan. 924, 952, 376 P.3d 70 (2016).

Edmond's claim fails for two reasons. First, Edmond does not show that his trial counsel's alleged failure to impeach Hendricks did not result from trial strategy. Second, as we will explain below, most of the alleged inconsistencies in Hendricks' testimony that Edmond points to are not true inconsistencies when the statements are read in context. Thus, trial counsel's performance was not deficient.

11

First, Edmond argues that Hendricks was inconsistent by stating that he knew Edmond for maybe a month in his interview and then stating he knew him for a few weeks at the preliminary hearing. But in reading the taped interview transcript attached to Edmond's motion, Hendricks responded to the questions about how long he knew Edmond by stating: "It ain't been but a month if that. . . . Give or take I'm not sure, its [*sic*], the past few weeks have been, been blurry." Hendricks' response that he had not known Edmond "but a month if that" is not inconsistent with his later testimony that he had known him a few weeks. Thus, trial counsel's performance was not deficient for failing to impeach Hendricks on this point.

Second, Edmond argues that Hendricks was inconsistent in stating in his taped interview that he knew Williams for a little bit before the incident and then testifying at trial that he only knew her as Edmond's girlfriend. But in reading the trial transcript, the question asked of Hendricks was "who was Tracey at that time? . . . did you know Tracey?" to which Hendricks responded "[Edmond]'s girlfriend is all I knew about her." The question asked in the taped interview was "do you know [Edmond]'s girlfriend?" to which Hendricks responded "[k]now her, I do know her now yes. . . . I've known her a little bit prior to that but not until you know I'd met all them at the, about the same time." And on cross-examination, Edmond's trial counsel did explore this line of inquiry by asking Hendricks how long he knew Williams, to which Hendricks responded, "I didn't up until associating with [Edmond] and them." Again, there does not seem to be true inconsistency between these statements and trial counsel did in fact cross-examine Hendricks on this point. Thus, trial counsel's performance was not deficient.

Third, Edmond argues that Hendricks stated in his taped interview that Edmond was the only one who backed him into a wall and then took his truck keys, but then he testified at trial that four people backed him into a wall and took his keys. In the taped interview transcript, Hendricks did not assert that Edmond was the "only" one who backed him into the wall. Hendricks was not asked whether there were others with

12

Edmond, instead he was asked "how did [Edmond] get you up against the wall?" Hendricks responded that he was "kind of already there" and "he just walked up on me." At trial, Hendricks again testified that Edmond got him up against the wall and counsel asked if Edmond could tell him a bit more about that. Hendricks was then specifically asked: "And who—was it multiple people or just [Edmond]?" to which he responded it was multiple people but that Edmond took the keys. Again, there does not appear to be any inconsistency, instead the trial testimony appears to be more detailed.

Fourth, Edmond argues that Hendricks stated in his interview that Edmond had his truck for six days but stated at trial that Edmond had his truck for a couple of weeks. The page Edmond cites from the interview transcript does not discuss how long Edmond had the truck. In reviewing the other included pages of the interview, the only place Hendricks discusses his truck is when he states Edmond took the truck on October 11 and that he filed a report on October 16. While Hendricks testified at trial that Edmond had his truck "a couple of weeks," he also testified that his truck was taken on October 10, 2011, and recovered on October 16, 2011. Again, there does not appear to be any substantial inconsistency in Hendricks' testimony.

Fifth, Edmond argues that Hendricks testified at the preliminary hearing that he does not allow anyone to drive his truck but testified at trial that he let Edmond drive his truck. Edmond is correct that at the preliminary hearing Hendricks stated that "nobody drives my truck." But Hendricks did not testify at trial that he let Edmond drive his truck:

> "Q. You saw [Edmond] between October 10th and October 16th, correct?
> "A. Probably, I believe.
> "Q. Well, you helped him move a TV, right?
> "A. Correct.
> "Q. Okay. And he had that truck during that time because you had loaned that to him in exchange for drugs?
> "A. Incorrect. But yeah, he did pick the TV up in my truck, yes.

13

"Q. So you're telling me that you didn't loan him this truck?

"A. No, I didn't."

Hendricks testified that Edmond used the truck to pick up a television, but he also clearly testified that he did not loan the truck to Edmond. This testimony is not stating that Hendricks let Edmond drive the truck. Again, Edmond has shown no inconsistency.

Sixth, Edmond argues that Hendricks stated in the taped interview that he never observed any injuries on Williams when she came out of the apartment complex, but he testified at trial that Williams had the "crap" beaten out of her. Hendricks stated in his interview, in response to whether he could see any injuries at that time that "I couldn't, I really couldn't see [Williams] that good." Hendricks then testified at trial that Williams "pretty much had the crap beat out of her" when she came out of the stairwell. This is an inconsistency, but further review of the record reveals that trial counsel did in fact cross-examine Hendricks on this inconsistency:

"Q. Okay. You would agree with me that when you initially talked to the police, you told Detective Jonker that when she comes out of the stairwell, you didn't see any injuries on her. You didn't see her.

"A. I don't recall saying that, no.

"[Defense Counsel]: Can I approach?

"THE COURT: Yes.

"By [Defense Counsel]:

"Q. I'm going to ask you to read this to yourself. Don't read it out loud. But start with probably right up there through there. Just read that to yourself. Let me know when you have finished reading.

"A. Okay.

"Q. Okay. Does this refresh your recollection about what you told Detective Jonker when you talked to him about what you saw that night?

"A. Yeah. Like I said a little bit ago, it's been almost a year, I don't—nobody has refreshed me on anything that I have said. I just—I couldn't remember, and I believe I said that a little bit ago, I'm pretty sure. But, yeah, that refreshes my memory.

14

"Q. So you told police initially when she comes out of the stairwell you didn't see any injuries, correct?

"A. No.

"Q. That's not what you told police?

"A. Correct.

"Q. Okay. Well, we'll just ask the police then.

"A. All right."

In sum, only one of the alleged inconsistencies in Hendricks' testimony was truly inconsistent, and Edmond's trial counsel effectively cross-examined Hendricks on that inconsistency. The record conclusively shows that trial counsel's performance was not deficient on this claim. Thus, the district court did not err in denying this claim without an evidentiary hearing.

*Was trial counsel ineffective for failing to object to the late endorsement of Fields and Hermes?*

Edmond next argues that trial counsel was ineffective for failing to object to the late endorsement of Fields and Hermes. Edmond argues that his trial counsel should have requested a continuance to investigate, interview, and gather facts on these witnesses and that his failure to request a continuance renders his performance ineffective.

Generally, the State must "endorse the names of all witnesses known to the prosecuting attorney upon the complaint, information and indictment at the time of filing it." K.S.A. 22-3201(g). But the Kansas Supreme Court interprets this statute as giving the district court broad discretion in allowing late endorsement of witnesses, and late endorsement is prohibited only when it will result in actual prejudice to the defendant. *State v. Brosseit*, 308 Kan. 743, 749, 423 P.3d 1036 (2018). A defendant shows actual prejudice when the late endorsement comes as a surprise and the testimony was critical or highly damaging in nature. 308 Kan. at 749.

15

Edmond's claim that trial counsel erred because he did not object to Hermes' late endorsement is factually incorrect. At the pretrial hearing, trial counsel objected to the late endorsement of Jessica Tobias, the nurse who saw Williams and discussed the incident with her. At trial, the State clarified that it had misread the medical record and the nurse they were calling was Debra Hermes, not Jessica Tobias. Trial counsel again objected, but the district court allowed the endorsement.

Moreover, trial counsel's performance was not deficient for failing to object to the late endorsement of Fields because Edmond could not show actual prejudice that would have prohibited the endorsement. Edmond does not argue that he was surprised by Fields' testimony. In fact, trial counsel even called Fields as a witness when arguing that Williams should not be found unavailable. Thus, the record conclusively shows that trial counsel's performance was not deficient in failing to object to the late endorsement of Fields and Hermes.

*Was trial counsel ineffective based on the cumulative effect of five other errors?*

Edmond next argues "that his trial counsel provided ineffective assistance by the cumulative effect of his failure to investigate Edmond's defense." Edmond identifies five "mistakes" committed by his trial counsel, including (1) trial counsel's admission that he had not seen photos of Williams before trial; (2) trial counsel's admission that he did not receive certain tapes during discovery; (3) trial counsel's abandonment of Edmond's defense that he rented the truck from Hendricks in exchange for drugs; (4) trial counsel's failure to call certain witnesses; and (5) trial counsel's admission that he had not listened to the tapes of Edmond's recorded jailhouse conversations before the trial.

Edmond develops no argument how any of these mistakes prejudiced his right to a fair trial, but he claims the cumulative effect of the mistakes caused his trial counsel to be ineffective. "When a litigant fails to adequately brief an issue it is deemed abandoned."

16

*State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015). In any event, we will address each of the "mistakes" Edmond asserts his trial counsel committed to assess his claim that the cumulative effect of the mistakes caused his trial counsel to be ineffective.

### 1) Trial counsel's admission that he had not seen photos of Williams.

Edmond argues that trial counsel was ineffective when he admitted at a pretrial hearing that he had not seen photos of Williams before trial. The statement at issue occurred during the following exchange about a photo of Williams' injuries:

> "[Prosecutor]: Judge, at this time I would move to admit State's Exhibit 1.
> "[Defense counsel]: I haven't seen it.
> (Exhibit handed to defense counsel.)
> "[Defense counsel]: No objection.
> "THE COURT: Okay. State's Exhibit 1 will be admitted."

When read in context, it seems trial counsel was stating that the prosecutor did not show him the exhibit it was trying to admit. The record reflects that the prosecutor handed trial counsel the photo for his review right after this comment and that after viewing the exhibit, trial counsel stated he did not object to its admission. Thus, trial counsel's performance was not deficient in this regard.

### 2) Trial counsel's admission that he did not receive tapes in discovery.

Edmond argues that trial counsel was deficient when he admitted that he had not received the tapes of the jailhouse calls during discovery. But in reviewing the record, there does not appear to be any factual support for Edmond's claim. During the trial, trial counsel stated: "I was told I had the discovery, I was told they were going to play portions. I didn't have—I wasn't told exactly what—you know what. They should have given me their transcript beforehand and I would have addressed it." Trial counsel made

this statement in arguing his objection to the State's discussion of the word "peckerwood" used on one of the tapes. Trial counsel did not state that he did not get the tapes in discovery or that he did not know they would be played for the jury, instead he stated that he felt the State should have given him a transcript of the portions of the tapes that it would present. Thus, there does not seem to be any factual basis in the record for Edmond's claim that trial counsel did not receive the tapes during discovery.

*3) Trial counsel's failure to present Edmond's defense.*

Edmond next claims that trial counsel erred in failing to present his defense that he rented the truck from Hendricks in exchange for drugs. This claim arises from the redaction of Williams' preliminary hearing testimony that was admitted into evidence at trial. Edmond argued at trial that he was prejudiced by the admission of Williams' redacted preliminary hearing transcript because he believed the redacted parts would have supported his defense that he did not take the truck by force. The trial court found that the redacted portions involved Edmond's drug use and that it did not want to taint the jury with statements that suggested Edmond was involved in other illegal activity. The trial court ultimately stated that if Edmond wanted to admit the redacted portions, then he was free to do so. Trial counsel conferred with Edmond and then stated:

"[Defense counsel]: Judge, in speaking with my client, I have explained to him that the concern I have is that by letting that information come in, that we then are opening the door to all kinds of questions that could be asked regarding criminal activity, criminal acts, possibly even criminal convictions. And in my opinion, that's not a good thing. It's also not a good thing to admit to the jury that, you know, I'm a drug dealer, because I think that they are going to view that in a light that's not favorable to him. So I think we could also certainly open the door to—we are certainly going to open the door to the drug trafficking, which is going to let the State—you know, I think the State could —I don't know if they wanted to, they could ask lots of questions, and we would still try and keep it out. But as the Court is aware, this wasn't the only investigation going on at

18

the time. So I just—I don't think that it's a good idea, for multiple reasons, to let in the redacted portions. My client agrees with me, and I just ask the Court to inquire.

"THE COURT: Okay. Then, Mr. Edmond, you understand what your attorney's reasoning is for this?

"THE DEFENDANT: Yes, sir, I do.

"THE COURT: Okay.

"[Defense counsel]: Can I just simply ask if that's what he wants to do?

"THE COURT: And is that what you're wanting to do, Mr. Edmond?

"THE DEFENDANT: Yeah. We'll just leave it out."

The record conclusively shows that trial counsel made a strategic decision after consultation with Edmond about the consequences of presenting the redacted portion of the transcript. Strategic choices made by counsel after a thorough investigation of law and facts are virtually unchallengeable. *Cheatham*, 296 Kan. at 437. This choice was well reasoned, and Edmond ultimately agreed with it.

Moreover, defense counsel cross-examined Hendricks about whether he loaned the truck to Edmond for drugs and mentioned this claim in closing argument. So Edmond was successful in presenting this defense to the jury. Thus, trial counsel's performance was not deficient in this regard.

*4) Trial counsel's failure to call witnesses.*

Edmond claims that trial counsel erred in failing to call Martha and Parisha Edmond and Sara Whitlock as witnesses even though they were subpoenaed and served. The State argues that Edmond did not explain what the witnesses' testimony would be, so any argument that this was an error is an incidental point. The State also argues that the decision of what witnesses to call belongs to counsel.

19

The State is correct that Edmond did not explain in his K.S.A. 60-1507 motion or in his appellate brief what Sara Whitlock would testify to, so the point is considered waived. See *Sprague*, 303 Kan. at 425 ("When a litigant fails to adequately brief an issue it is deemed abandoned."). Edmond explained in the memorandum supporting his K.S.A. 60-1507 motion that Martha would have disputed Hendricks' testimony about how he tried to recover his truck from the apartment complex, and Parisha would have testified that Edmond never took Hendricks' truck keys by force.

It is a strategic choice within counsel's province to decide what witnesses to call unless counsel lacks the information necessary to make an informed decision based on an inadequate investigation. *Sola-Morales*, 300 Kan. at 887. Edmond does not present any facts or argument that would meet his burden of showing that the failure to call Martha and Parisha did not result from strategy following adequate investigation. Edmond concedes that Martha and Parisha were subpoenaed and served to testify at trial, so trial counsel must have done some investigation and must have known what the witnesses would say when he ultimately decided not to call them. Clearly, the credibility of these witnesses could have been impeached because they were related to Edmond. And although the witnesses' claimed testimony may have been relevant to the robbery charge against Edmond, the testimony would not have been central to Edmond's defense on the charges of attempted second-degree murder, aggravated kidnapping, and aggravated battery of Williams. Thus, based on the record, Edmond fails to show that his trial counsel's performance was deficient and he also fails to show prejudice.

*5) Trial counsel's failure to listen to the tapes.*

Edmond argues that trial counsel erred when he admitted that he had not listened to the tapes of Edmond's recorded jailhouse conversations before the trial. In support of his argument, Edmond points to trial counsel's statement that "[h]ad [he] known that that specific word [peckerwood] was going to be used, [he] would have objected." The State

20

argues that trial counsel never admitted that he did not listen to the tapes, but he only admitted that he was not familiar with every word in the tapes. The State also argues that Edmond failed to allege how he was prejudiced by this deficiency.

Here, it is unclear what trial counsel meant by this statement. One interpretation is that he had not listened to the tapes as Edmond argues. On the other hand, trial counsel could have reviewed the tapes and either not known the significance of the word or simply glossed over it. In any case, even classifying this issue as an error, Edmond is not entitled to relief on his cumulative error claim because a single error cannot constitute cumulative error. See *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010).

Additionally, Edmond in not entitled to relief on this claim standing alone as he has not shown prejudice. The potential prejudice caused by the use of the word "peckerwood" was raised and discussed many times in the original trial, including when Edmond moved for a mistrial and for a new trial. *Edmond*, 2014 WL 2402001, at *5-7. Edmond appealed the denial of his motion for mistrial and his motion for new trial and this court ruled that the district court was correct in finding that there was not a fundamental failure in the proceeding due to the use of this word because "the meaning of the term is not commonly known or generally understood to be particularly offensive in a racial context." 2014 WL 2402001, at *6. Edmond advances no new argument establishing prejudice in relation to this word.

In sum, the district court did not err in denying Edmond's claim that his trial counsel provided ineffective assistance by the cumulative effect of his failure to investigate Edmond's defense. As for the five "mistakes" identified by Edmond, the record reflects either that counsel's performance was not deficient or that Edmond failed to show how he was prejudiced by the performance of his counsel.

21

*Was trial counsel ineffective for failing to object to Williams' out-of-court statements?*

Edmond argues in his supplemental brief that his trial counsel was ineffective for failing to object to the admission of Williams' preliminary hearing testimony and her out-of-court statements presented through the testimony of Hermes, Fields, Hendricks, and Jonker. He argues that this testimony was hearsay and it violated his rights under the Confrontation Clause of the United States and Kansas Constitutions. The State argues that Edmond identifies no specific testimony that he believed to be hearsay and thus did not adequately brief the issue. The State also argues that Edmond's arguments have no merit because on direct appeal to this court, in discussing Edmond's challenge to the sufficiency of the evidence, our court implicitly found that the statements met a hearsay exception.

To begin, the district court erred by relying on res judicata to summarily deny this claim. The district court summarily denied three of Edmond's claims—that the trial court erred in finding that Williams was unavailable, that the trial court erred in admitting hearsay statements of Williams, and that his trial counsel was ineffective for failing to object to Williams' hearsay statements—finding that these issues were addressed on his direct appeal. Edmond's direct appeal addressed his claims that the trial court erred in finding Williams unavailable and the trial court erred in admitting her hearsay statements. See *Edmond*, 2014 WL 2402001, at *10-11. But Edmond raised no claim in his direct appeal that his trial counsel was ineffective for failing to object to Williams' hearsay statements. Thus, the district court erred in summarily denying the ineffective assistance of counsel claim based on res judicata.

In any event, Edmond's claim has no merit. Edmond first argues that trial counsel was ineffective for failing to object to the admission of Williams' preliminary hearing testimony. But Edmond can show no prejudice based on trial counsel's failure to object. On direct appeal, this court agreed with the district court that Williams' preliminary

22

hearing testimony was admissible because she was unavailable at trial. *Edmond*, 2014 WL 2402001, at *10-11. So even if trial counsel had objected, the preliminary hearing testimony would have been admitted. Thus, Edmond cannot show prejudice based on trial counsel's failure to object to the admission of the preliminary hearing testimony.

Edmond also argues that trial counsel was ineffective for failing to object to the admission of Williams' out-of-court statements to Hermes, Fields, Hendricks, and Jonker. As the State points out, Edmond identifies no specific testimony from these witnesses that he believed to be hearsay. But even if some statements from these witnesses were inadmissible hearsay, Edmond cannot show prejudice. Contrary to Edmond's contention, even without the alleged hearsay statements, the State still had other evidence to support its case, including the surveillance video that showed Edmond pulling Williams by the arm into the stairwell. The State also presented Hendricks' first-hand observations of the group leaving the apartment and dragging Williams to the truck; Edmond, Williams, and Edmond's cousin driving off in the truck; and Williams' injuries when the group came back. Hendricks also testified that he saw Edmond hit Williams once and that Edmond told Hendricks to look at Williams and said, "that's what happens when somebody crosses him." Because Edmond cannot show prejudice, he is not entitled to an evidentiary hearing on this claim.

## WAS EDMOND'S DIRECT APPEAL COUNSEL INEFFECTIVE?

In his supplemental brief, Edmond argues, for the first time on appeal, that his appellate counsel was ineffective for: (1) failing to raise claims that trial counsel was ineffective; (2) failing to request a *Van Cleave* remand on trial counsel's conflict of interest; and (3) failing to brief "a number of his potentially meritorious issues." But claims of ineffective assistance of counsel raised for the first time on appeal generally will not be considered. *Robertson v. State*, 288 Kan. 217, 227, 201 P.3d 691 (2009). Edmond advances no argument or authority to support his contention that he can raise

23

this claim for the first time on appeal. Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 35) requires an appellant to explain why an issue not raised below should be considered for the first time on appeal. Our Supreme Court has held that Rule 6.02(a)(5) should be strictly enforced. *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015). And other than making a conclusory claim that his appellate counsel was ineffective, Edmond does not mention the issue again in his brief. When a litigant fails to adequately brief an issue, it is deemed abandoned. *Sprague*, 303 Kan. at 425.

### WAS EDMOND'S K.S.A. 60-1507 COUNSEL INEFFECTIVE?

Edmond also argues in his supplemental brief that his K.S.A. 60-1507 counsel was ineffective. He raises this issue for the first time on appeal. An appellate court may consider the quality of assistance provided by K.S.A. 60-1507 counsel for the first time on appeal so long as the record is sufficient, or the claim is clearly without merit. *Mundy v. State*, 307 Kan. 280, 294, 408 P.3d 965 (2018). We do not consider the record to be sufficient to address this claim for the first time on appeal.

Moreover, Edmond again fails to adequately brief the issue. Other than making a conclusory claim that his K.S.A. 60-1507 counsel was ineffective, Edmond does not mention the issue again in his brief. When a litigant fails to adequately brief an issue, it is deemed abandoned. *Sprague*, 303 Kan. at 425. Thus, we will not address Edmond's claim that his K.S.A. 60-1507 counsel was ineffective.

Affirmed.